# STUART v. GAY.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR
THE DISTRICT OF WEST VIRGINIA.

No. 255. Submitted April 26, 1888. — Decided May 14, 1888.

When a decree of foreclosure and sale of mortgaged property grants to the
purchaser a credit for part of the purchase money, reserving a lien upon
the property to enforce its payment, the court may, if the purchaser
make default, and no rights of innocent third parties have intervened,
order a resale of the property upon a rule to the purchaser to show cause
why it should not be done.

The decree of foreclosure in this case conferred upon the purchaser at the
foreclosure sale no such right of acquiring the securities of the lower
classes to be paid from the fund realized from the sale, as would authorize
him, as such purchaser, to dispute, in a proceeding in the original suit for
foreclosure to compel payment of the amount remaining due of the pur-
chase money, the computations by the master, confirmed by the decree
of the court, of the amounts which the creditors of the higher classes
were to receive from the fund.

In marshalling the classes of debts entitled to be paid out of a fund arising
from a sale of mortgaged property under a decree of foreclosure, it is
immaterial whether the master calculates the interest to a day prior to
the date of the decree of sale, or up to that day, for the purpose of de-
termining the principal sum that is to bear interest thereafter.

THE decrees which are the subject of the present appeal
were rendered in a suit brought to enforce certain deeds of
trust and mortgage liens upon a tract of land in Greenbrier
County, West Virginia, known as the White Sulphur Springs,
in which it became necessary to sell the property for the pay-
ment of debts, and to marshall the liens on the same in the
order of their priority. The bill was filed in March, 1868, by
Charles S. Gay and his wife and others, creditors and lien
holders, suing as well for themselves as for all other creditors
having liens on the real estate, the title to which, subject to
the incumbrances, was then vested in the White Sulphur
Springs Company. A portion of the indebtedness was repre-
sented by negotiable bonds, with coupons representing accru-
ing interest thereon, and some of these had been severed

from the principal obligation and bought for value by other holders.

On April 23, 1868, the cause was referred to a master to report the amount and priorities of all liens upon the property, whether created by mortgage, deed of trust, judgment, or otherwise. On April 21, 1876, the master filed a report giving a statement of the liens, the name of each creditor, with the amount of the principal debt due to each, the amount of the interest accrued thereon, and showing the total debt in each case, including principal and interest. The indebtedness was classified according to the order of priority of the liens. The first six classes of debts enumerated in this report are the only ones material to be considered, as in any event they absorb the whole amount for which the property was subsequently sold. In the aggregate they amounted to $299,857.88, of which $185,133.27 is principal, and $114,724.61 is interest. The interest was calculated to and aggregated as of the same date, October 15, 1875, as to all the debts except the debts in the first class known as the Singleton trust debt, upon which the unpaid interest, amounting to $36,000, was calculated to July 1, 1868; the master reporting that all interest accrued on this debt after that date had been paid.

On April 28, 1876, the court by a decree confirmed this report, no exception having been taken thereto, the decree having in fact been entered by the consent of parties. That decree also contained a clause declaring that the interest on the Singleton debt of $36,000, which had remained unpaid from July 1, 1868, should constitute a principal sum, bearing interest from the date of the decree. There was no express declaration in the decree in respect to the computation of interest on the other debts after October 15, 1875.

On May 5, 1877, a decree of sale was made in which there was no finding of any specific amount due, in default of the payment of which the property should be sold, but a recital that it appeared to the court " that it is now for the interest of all the parties to this suit and of all others interested in the subject involved therein, and there being now no objection, except on the part of the White Sulphur Springs Company, that

there shall be a sale of the property known as the White Sulphur Springs property, and an application of proceeds of said sale among the parties entitled thereto, according to their legal rights and priorities." The decree appointed commissioners to make the sale, who were required to receive from the purchaser the payment of ten per cent of the purchase money in cash at the time of the sale, and for the residue giving a credit of one, two, three, four, and five years, in equal instalments, with interest thereon from the day of sale, and requiring good personal security for the payment of the first of said annual instalments, and retaining the title as further security for all of said instalments, or, in lieu of such personal security required of the purchaser for the first instalment of purchase money, the commissioners were authorized to receive from the purchaser as collateral security therefor any evidences of debt proved in the cause, and which it may appear to the commissioners will certainly be paid from the proceeds of the sale, and which may belong to the purchaser offering the same as collateral security, the just and fair amount of which collateral shall be determined by the commissioners.

On May 4, 1878, no sale having been made, the court entered a decree reciting that the interest on three bonds known as Erskine bonds, being those reported in class No. 6 by the master, and being designated as No. 1, 2, and 3 of that class, for the year ending October 15, 1868, and on the Beard bond, designated as No. 4, in the same class, from October 15, 1868, to October 15, 1877, except four per cent for the two years ending October 15, 1875, and October 15, 1877, had not been paid; that the property was ample to pay these bonds, principal and interest, as well as all prior liens, and that a sale of the property had been postponed in the interest of subsequent liens; and adjudged that the said unpaid interest on said bonds should stand on the same footing with the interest on said bonds which is evidenced by coupons, and bear interest from the dates at which said interest became due until paid, and that the assignees and holders of the interest of said bonds for said years, or any part thereof which had been assigned and transferred by the holders of the bonds, should be entitled to have

priority over said bonds, coupons, and other interest not transferred; such interest, however, transferred as aforesaid, to be entitled to priority according to the dates of its maturity.

On May 4, 1880, a decree was rendered confirming a sale of the premises previously reported as having been made by the commissioner for that purpose, to William A. Stuart, for $340,000, wherein it was directed that the purchaser be at once put in possession of the property, the title thereto being retained by the court as security for the payment of the purchase money. The commissioners were directed to proceed to collect from the purchaser the cash payment of ten per cent upon the aggregate of the purchase money. The decree also contained a declaration that the court " will hereafter make such orders as may be proper for the collection of the deferred instalments of the purchase money and the distribution of the same among the parties to this suit, according to their respective rights and interests." The commissioners in their report of the sale stated that they had taken from the purchaser his five bonds, each for the sum of $61,290, payable, respectively, at one, two, three, four, and five years, bearing six per cent interest from the day of sale, and on the bond due one year after date that they had taken personal security.

On March 1, 1882, a decree was made appointing a special commissioner for that purpose, and directing him to execute to William Stuart a deed with a special warranty for all the property purchased by him at the sale made on March 31, 1880, in pursuance of the decree of sale previously rendered in the cause; and directing that the deed reserve a lien upon its face for the unpaid purchase money until the same is fully paid off and discharged. The commissioner was further authorized and directed to settle with the said Stuart at any time, upon his application, so far as the bonds for the purchase money had already matured, or as the same should thereafter mature, " by crediting upon the said bonds the amounts to which the said William A. Stuart is entitled to credit for the liens held by him, as recognized by the previous decrees of this court establishing the order and priority of liens, and by receiving from him in cash so much of the

amount of said bonds as may be going to other lien holders;" and the commissioner "is also authorized to cancel and deliver to said William A. Stuart any one or more of his said bonds, whether the same have matured or not, on being satisfied that the said Stuart is then holder and owner of all the claims payable out of the proceeds of such bond or bonds." The commissioner was also instructed to report to the court from time to time his proceedings under the decree.

On January 5, 1884, a decree was made upon a report of the commissioners of sale asking to be' instructed as to the proper manner of disbursing the fund. It was therein ordered and decreed "that the commissioners of sale, in disbursing and distributing the proceeds of the sale of the White Sulphur Springs property heretofore made by them under a decree of this court in this cause, and in paying therewith the debts heretofore reported and decreed to be paid, shall calculate interest upon the aggregate amount of the principal and interest thereof, aggregated as of October 15, 1875, the date to which the calculations are brought in the report of commissioner H. M. Mathews, heretofore made, filed, and confirmed in this cause, and not upon the original principals alone."

On May 12, 1885, the commissioners of sale reported that the fourth and fifth bonds executed by Stuart, the purchaser, were past due and unpaid, each of said bonds being for the sum of $61,290, with interest from March 30, 1880, on which there was due at the date of said report the sum of $160,-212.06. An order was thereon entered that a rule issue against the said William A. Stuart, returnable on the 23d day of the same month, requiring him to appear and show cause why the property sold as aforesaid by the commissioners of sale in this cause to him should not be resold at public auction for cash to pay the unsatisfied instalments of purchase money due by him as aforesaid, and why a decree should not be made against him for so much of the unpaid purchase money as the property upon a resale might not pay off and discharge, together with the costs of the proceedings. This rule having been returned served, Stuart, by leave of the court,

filed a petition praying that the decree of January 5, 1884, be vacated, and that in lieu thereof the commissioners of sale be directed, in distributing the proceeds of the sale of said real estate and paying the five first liens thereon, to calculate the interest on the original principal of each of said liens, and not upon the principal and interest thereof aggregated and compounded as directed by the decree of January 5, 1884. In that petition he sets forth that by computing interest on the principal sums, as set out in the master's report of April 21, 1876, included in the first six classes, there would be due in the aggregate about the sum of $330,000 on the day of sale, and that according to that calculation the net proceeds of the sale, after deducting the costs of suit, would pay off in full the five first liens and about $130,000 on the sixth, but a very much less amount computing interest on the principal and interest aggregated of said liens from October 15, 1875. The petition further alleges that before the sale of the real estate to himself, he became the purchaser of a large number of the debts reported as liens in the sixth class, and thus became entitled to all of the proceeds of the sale applicable to that class, with certain exceptions therein stated. The petition thereupon states that by the order of January 5, 1884, made long after the sale, and after the petitioner had become entitled to the proceeds thereof applicable to the larger part of the sixth class of debts, the interest-bearing fund of said six first liens was changed from $185,133.27, the original principal of said liens, to the sum of $299,857.88, the principal and interest of said liens aggregated as of October 15, 1875, and the sum of $114,724.61 interest on said six first liens is thus made to bear interest for almost four and one-half years before sale is made, and also after sale until reached in their proper order of priority as the purchase money of said real estate fell due under the said sale, and that in this way a sum over $30,000 of the proceeds of said sale is applied to the payment of interest upon the interest of said liens, the principal part of which will, under said order of January 5, 1884, be applicable to the interest computed on the said sixth lien, and the entire amount of which will be deducted from the

principal of the debts in the said sixth lien, all of which principal is owned and controlled by the petitioner except $907.67. On May 25, 1885, this petition was considered, its prayer for relief denied, and the decree of January 5, 1884, confirmed. Stuart then moved the court to quash and discharge the rule awarded against him on a previous day of the term, which motion the court overruled; and thereupon, by leave of the court, he filed an answer to the rule; when a decree was rendered finding due from Stuart on account of the purchase money for the said sale, the sum of $160,212.06, with interest thereon from May 12, 1885, for the payment of which a decree was rendered against him, and that unless within thirty days from that date he should pay the amount decreed against him, the commissioners should proceed, upon proper notice, to resell the property heretofore sold in the cause and bought by him, at publi.¸ auction, to the highest bidder for cash. From this decree Stuart prayed an appeal, which the court refused to allow "because the decrees in this cause fixing the rights of the parties, determining the amounts, dignities, and priorities of the debts, and directing sale of the property, were all entered more than five years ago, and the decree of January 5, 1884, was simply explanatory of a former decree."

Subsequently, on July 2, 1885, a petition for an appeal was presented by Stuart to Mr. Justice Harlan of this court, praying an appeal which was allowed, from the decree of January 5, 1884, compounding the interest on the debts theretofore reported in said cause against the company as of October 15, 1875, and directing the commissioners, in distributing the proceeds of the sale of the company's property, to pay interest upon the interest on the said debts as of the date last aforesaid, and from the decree rendered May 25, 1885, rejecting the petition for relief from the decree of January 5, 1884, and directing a resale of the property. The errors assigned are nine in number, but may be reduced to two:

First. That the decree of January 5, 1884, is erroneous in aggregating all the principal and interest of all the debts reported against the White Sulphur Springs Company as of the 15th day of Octo₁ r, 1875, as stated in said Commissioner

Mathews's report, and making said aggregate an interest-bearing fund as of that date. And in reference to this it is stated that "the court, by its decrees of April 28, 1875, and of May 4, 1878, had adjudicated just how much of the interest on these debts should bear interest and from what time, viz., $36,000 of the Singleton debt from April 28, 1876; one year's interest on the Erskine debt from October 15, 1868; and the interest on the S. C. Beard debt of $907.67 for the years ending October 15, 1868, to October 15, 1877, subject to certain credits, and gave special reasons therefor; and it was error in the court to reverse or modify the adjudication so made, especially after your petitioner had become the owner of liens affected by said adjudication and the purchaser of the property, with the right to use said liens in payment therefor, relying upon the adjudication aforesaid, and as the same had been adjudicated" in accordance with the decree of March 1, 1882.

Second. The decree of May 25, 1885, is erroneous in overruling the motion to quash and discharge the rule for a resale, and in decreeing a resale of the property upon the rule after the court had parted with the title thereto, and had conveyed the property to the appellant, retaining a vendor's lien in the deed for the unpaid purchase money.

*Mr. E. B. Knight* for appellant cited: *Ballard* v. *Whitlock*, 18 Grattan, 235; *Clarkson* v. *Read*, 15 Grattan, 288; *Glenn* v. *Blackford*, 23 West Va. 182; *Wiswall* v. *Sampson*, 14 How. 52; *Story* v. *Livingston*, 13 Pet. 359; *Lightfoot* v. *Price*, 4 Hen. & Munf. 431; *Genin* v. *Ingersoll*, 11 West Va. 549; *Lamb* v. *Cecil*, 25 West Va. 288.

*Mr. John E. Kenna* and *Mr. Alexander F. Mathews* for appellees cited: *Fleming* v. *Holt*, 12 West Va. 143; *Ruffner* v. *Hewitt*, 14 West Va. 737; *Sneed* v. *Wister*, 8 Wheat. 691; *Koshkonong* v. *Burton*, 104 U. S. 668; *Railroad Co.* v. *Turrill*, 101 U. S. 836; *Holden* v. *Trust Co.*, 100 U. S. 72; *Goddard* v. *Foster*, 17 Wall. 123; *Cromwell* v. *Sac County*, 94 U. S. 351; *Hemmenway* v. *Fisher*, 20 How. 255; *Perkins* v.

*Fourniquet*, 14 How. 328; *Mitchell* v. *Harmony*, 13 How. 115; *Simmons* v. *Garrett*, McCahon (Kansas), 82; *Reeside* v. *United States*, Devereux C. Cl. 216; *Young* v. *Godbe*, 15 Wall. 562; *Burgess* v. *Seligman*, 107 U. S. 20; *Bickman* v. *Cross*, 2 Ves. Sen. 471; *Binnet* v. *Edwards*, 2 Vern. 392; *Bacon* v. *Clark*, 1 P. Wms. 478; *Turner* v. *Turner*, 1 Jacob & Walker, 39; *Brown* v. *Barkham*, 1 P. Wms. 652; *Astley* v. *Powis*, 1 Ves. Sen. 495; *Raphael* v. *Boehm*, 11 Ves. 92; *Dunbar* v. *Woodcock*, 10 Leigh, 628; *Requa* v. *Rea*, 2 Paige, 339; *Harding* v. *Harding*, 4 Myln. & Cr. 514; *Clarkson* v. *Read*, 15 Grattan, 288.

MR. JUSTICE MATTHEWS, after stating the case as above reported, delivered the opinion of the court.

The appellant cannot justly complain of the decree for a resale on the ground that it was rendered upon a rule to show cause. It does not appear that he was or could have been prejudiced by the summary nature of the procedure. He had full opportunity to answer, and was heard upon all the matters of defence, both in his answer to the rule and his petition for a rehearing of the decree of January 5, 1884. All the equities to which the appellant conceived himself entitled were fairly and fully before the court. No rights of innocent strangers had intervened, although the appellant had conveyed his title to the White Sulphur Springs Company. That company acquired its interest *pendente lite*, and with full notice from the record that the purchase money was in part unpaid, and that there was a subsisting lien reserved as security for its payment. The action of the court was simply to enforce its own decree against a purchaser from itself to compel compliance on his part with his contract. The cause was open and pending, awaiting a final decree distributing the proceeds of the sale, in which no further step could be taken until those proceeds were paid into court in compliance with its orders. For that purpose the court had control of the title to the real estate sold by virtue of the decree for sale, and the reservation of a lien for the unpaid purchase money expressed in the deed.

There was no reason for a resort to an original bill; the most suitable and convenient practice was to enforce the obligation of the purchaser in the same cause by a supplemental proceeding, and it was within the discretion of the court to adopt as the proper method in this case the form of a rule to show cause.

Such is the clear implication from what was said by this court in *Koontz* v. *Northern Bank*, 16 Wall. 196, 202 : " If . . . the court was deceived by the report of the receiver or master, and the purchaser participated in creating the deception, it could undoubtedly, at any time before the rights of innocent purchasers had intervened, have set the whole proceedings, including the deed, aside. But after the rights of such third parties had intervened its authority in that respect could only be exercised consistently with protection to those rights."

The rule is thus laid down in 2 Daniell's Chancery Practice, 1282, c. 29, § 1 : " According, however, to the present practice, a more complete remedy is afforded against a purchaser refusing without cause to fulfil his contract; for the plaintiff may obtain an order for the estate to be resold and for the purchaser to pay, as well the expenses arising from the non-completion of the purchase, the application, and the resale, as also any deficiency in price arising upon the second sale. This order was made by Lord Cottenham in *Harding* v. *Harding*, 4 Myln. & Cr. 514, after consultation with the other judges of the court; and although in that case the purchaser was a defendant in the cause, it does not seem that that fact was considered as necessary in order to enable such an order to be made." In *Campbell* v. *Gardner*, 3 Stockton (11 N. J. Eq.) 423, 425, it was held that after a sale upon an execution out of a court of chancery, and a delivery of the deed, the court may, upon a proper cause made, open a sale upon a petition, and it is not a valid objection to this course that the deed has become a matter of record. If a resale is ordered, the court may require the first purchaser to release to the purchaser on the resale all the title he may have acquired, so that the title may stand upon the record wholly disembarrassed. See *Conover* v. *Walling*, 2 McCarter (15 N. J. Eq.) 173.

As the court below committed no error to the prejudice of the appellant in the mode of the procedure, we have to consider whether it disallowed any substantial equity to which he was entitled. The equity of the appellant, then asserted and here renewed, arises upon his construction of the orders and decrees of the court. The decree of March 1, 1882, upon the authority of which the deed was executed and delivered to the purchaser, and which directed that a lien should be reserved therein for the unpaid purchase money until the same is fully paid off and discharged, also directed the commissioners to settle with the purchaser upon his application, so far as the bonds for the purchase money had already matured, or as the same should thereafter mature, " by crediting upon the said bonds the amounts to which the said William A. Stuart is entitled to credit for the liens held by him, as recognized by the previous decrees of this court establishing the order and priority of liens, and by receiving from him in cash so much of the amount of said bonds as may be going to other lien holders." And the commissioners were " also authorized to cancel and deliver to said William A. Stuart any one or more of his said bonds, whether the same have matured or not, on being satisfied that the said Stuart is then holder and owner of all the claims payable out of the proceeds of such bond or bonds."

It appears that in pursuance of this authority, the commissioners of sale, on October 20, 1883, received from Stuart certain securities designated by reference to the list and classification contained in the master's report of April 21, 1876, specifying the amount of the principal sum represented by each, but without any calculation of interest, or any statement of the aggregate amount which on account thereof was to be credited on the bonds of the purchaser given for the purchase money. The language of the receipt given by the commissioners is: " Received of W. A. Stuart the above securities, which are applied first to the discharge of the three purchase-money bonds of said Stuart first falling due, given for the Greenbrier White Sulphur Springs property sold by the United States District Court, at Charleston, the said bonds

being for $61,290 each, and bearing interest from March 31, 1880, and which are this day delivered to said Stuart. The amount covered by this list of securities, after discharging the three bonds aforesaid, is to be by us credited on the fourth bond of said Stuart of like amount with each of the other three and bearing interest from same time."

The specific claim made by the appellant is, that he is entitled to have these securities credited on his purchase-money bonds at an amount in the aggregate ascertained by a calculation of simple interest, upon the face of the principal sum, from the time when interest began to accrue and became in default until the date of their application to the payment of the purchase-money bonds, with the exception of the instances where by previous decrees interest upon interest had been expressly allowed; whereas the rule adopted by the court by the order of January 5, 1884, required the commissioners of sale, in distributing the proceeds of sale, and in paying therewith the debts reported and decreed to be paid, to calculate interest upon the aggregate amount of principal and interest thereof aggregated as of October 15, 1875, the date to which the calculations are brought in the report of the master filed April 21, 1876.

It is complained of this decree that it was made after the rights of the parties had become fixed by what had already been done under the previous orders of the court, and that the situation of the appellant was thereby altered greatly to his disadvantage. In reliance upon his construction of the previous orders of the court, the appellant had become the purchaser of almost all the obligations enumerated in the sixth class of the master's report in the expectation that, upon a calculation of the amount due to those entitled to priority, the obligations thus acquired by him would be satisfied, or nearly so, out of the proceeds of the sale. The transactions by which he acquired the ownership of these claims took place, respectively, on April 23, 1875, March 15, 1876, and March 31, 1880, the last being the date of the sale.

It is evident, in the first place, that the cause of complaint asserted by the appellant does not belong to him legitimately

in his capacity as purchaser. The decree for sale rendered May 15, 1877, did not contemplate payment of the purchase money otherwise than in money. It gave a credit running through a period of five years in equal annual instalments, with interest on each. There was nothing in the decree which authorized the purchaser to assume that he would not be called upon to pay each instalment as it fell due in cash. As a purchaser, therefore, bound for the payment of specific sums at given dates, and who cannot be compelled to pay more, and has no right to expect to pay less, it must be a matter of indifference how the proceeds of that sale shall be distributed among the creditors entitled thereto. The different modes of computing interest on the debts to be paid may affect relatively the creditors themselves, giving to one class more and to the other less, but it can make no difference in the amount of the fund to be distributed arising from the proceeds of the sale. The complaint of the appellant, therefore, if he has any, must be put forward in his capacity as a creditor in respect to his rights upon distribution; but upon the view most favorable to him the distribution of the proceeds of the sale, and all questions arising thereon as between creditors, were before the court and undecided, except in the instances already referred to where express declarations were made in respect to the mode of computing interest upon interest in individual cases. The appellant was bound to know, and ought to have acted upon the assumption, that all possible matters of question to arise upon the distribution of the proceeds of the sale were still open for the final decision of the court. If he chose to act upon his individual judgment of what that decision would be, he acted at his peril. The decree of January 5, 1884, was such a decision, directing the mode of calculating interest upon the debt in distributing the proceeds of sale, and there is nothing in it inconsistent with any prior decision or decree of the court upon the same subject. Neither the decree of sale of May 5, 1877, nor the decree of March 1, 1882, directing the execution of the deed and reserving a lien for the unpaid purchase money, contained any direction as to the mode of computing interest upon the debts to be

paid. It cannot, therefore, be now held that the appellant has been misled to his disadvantage in having acted upon the faith of any of the previous decrees of the court in the cause.

The question, however, still recurs whether the rule for computing interest on the debts as the basis of distribution adopted by the court in its decree of January 5, 1884, is correct as a matter of law. On this point there is no reason for doubt. The decree of sale, as we have already stated, contained no finding of the amount of the indebtedness, nor of the persons to whom it was owing, and no order for its payment as a condition of redeeming the property from the necessity of sale. But the report of the master of April 21, 1876, contained a full and carefully prepared detail of all the items constituting the indebtedness, with a list of the creditors, a classification according to the order of priority in the matter of lien, and a calculation of interest to October 15, 1875, upon all debts, except those embraced in class No. 1, in respect to which special provision was subsequently made showing the total amount then due to each creditor. It is not stated anywhere in the record why the date of October 15, 1875, was selected by the master as a place of rest in the calculation of interest, but it must have been taken as the most convenient day for calculations in reference to closing the report, which evidently required considerable time for its preparation. If the calculation had been made as of the date of the decree for sale, with a view to the insertion therein of the amounts due to the several creditors, on payment of which the sale might be averted, the interest would have been brought down most properly to that date and added to the principal to constitute the whole sum then payable. If not paid at that time, the aggregate of principal and interest thus combined would have constituted the new principal, which, according to the uniform practice of the court, would bear interest from that date. In that case there could have been no complaint made against compounding interest. We think a similar effect must be given to the decree of the court confirming the master's report made April 28, 1876. It substantially declared the amount due October 15, 1875, as consisting of the principal

sums and interest to that date added for the purposes of the sale and distribution, and the decree of January 5, 1884, directing the calculation of interest for purposes of distribution upon the aggregate amount of the principal and interest as of October 15, 1875, was only a proper explanation of the decree of April 28, 1876, confirming the master's report. The date of the confirmation of that report was a suitable period in the progress of the cause, where the creditors were so numerous and the calculations so complicated, for the court to fix, for the information and guidance of all concerned, the amount severally due to each creditor with the order of priority in which he was entitled to be paid. The amounts to be found due necessarily embraced the principal sum with the accrued interest up to a fixed date, and from that period the aggregate became the sum of the debt, the whole of which thenceforth properly carried interest. No exception was taken to the report; it was confirmed by the court; and, in our opinion, it cannot reasonably bear any other construction than that which the court subsequently placed upon it.

Upon the whole case, no injustice has been done the appellant; and the decree of the District Court of West Virginia is

*Affirmed.*