249 N.J. Super. 586 (1991)
592 A.2d 1244
INVESTORS & LENDERS, LTD., PLAINTIFF,
v.
LAWRENCE J. FINNEGAN, ET AL, DEFENDANTS.
JAMES MARANDO AND DEBBIE YANIGA, PLAINTIFFS,
v.
WILLIAM LANZARO, SHERIFF, MONMOUTH COUNTY, DEFENDANT.
Superior Court of New Jersey, Chancery Division Monmouth County.
March 20, 1991.
*587 Richard J. Schwartz for bidders, Marjorie and Bernardo Pagan (Schwartz & Schwartz, attorneys).
Robert F. Dato for bidders Marando and Yaniga.
Edward A. Dreskin for First Fidelity Bank.
Robert J. Hrebek for William Lanzaro, Sheriff of Monmouth County.
McGANN, Jr., J.S.C.
Once again[1] the failure of the Legislature to regulate the terms and conditions under which Sheriff's are to conduct execution sales, leads to unnecessary litigation as well as lack of state-wide uniformity in the conduct of such sales.
The facts are these. Investors & Lenders foreclosed on a second mortgage in the face amount of $20,000 it held on the Finnegan residence property. On July 14, 1988 default was entered against the Finnegans. On that same date an Amendment to the Complaint was filed adding First Fidelity Bank as a party defendant by virtue of a third mortgage in the face amount of $30,000 which it held on the property. Final Judgment in foreclosure was signed and filed on December 15, 1988. The third mortgage was not reported on in that judgment. The amount due to Investors & Lenders was fixed at $23,719.22 *588 plus costs of $603.05. A writ of execution directing the Sheriff of Monmouth County to sell the property issued that same day. The Sheriff duly advertised the sale and on February 26, 1990 the property was struck off to Debbie Yaniga and James Marando on their bid of $88,000. They signed the standard conditions of Sale and paid a deposit of $21,000.[2] The certification of Debbie Yaniga (not disputed by any other party hereto) states:
3. The bidding regulations (see Exhibit "A" to the Verified Complaint) was a document circulated amongst all bidders by a representative of the Sheriff's Office before the actual Sheriff's sale. We were advised that we had to adhere to the provisions of this notice. We considered this document to be one officially prepared by the Sheriff's Office and relied upon the information contained therein before I bid. I knew that if I could not put together the necessary financing after I bid on the property that I would lose a certain amount of money, that the property could be readvertised, but it was clear and certain that I would receive the balance of my deposit if I could not complete the purchase. If I had known that my deposit was at jeopardy, I would never have considered bidding on this house.
4. I am totally unfamiliar with the bidding procedure and foreclosures. I was buying this house to move into same, and not for speculation. This whole foreclosure process was brand new to me and I very much relied upon these bidding rules in order to give me guidance through the foreclosure sale procedure.
The standard conditions of sale prepared by the Sheriff, which are read aloud prior to the auction and thereafter signed by the successful bidder contain the following pertinent language:
THIRD.  If the successful bidder neglects or refuses, for any reason, to accept and sign these conditions at the close of the sale or fails, for any reason, to pay the full price as bid and accept the Deed, the subject property shall be readvertised and re-bid; in such case the successful bidder at the first sale shall bear the expenses of the first sale (as well as the second sale) and any balance of the purchase price or deposit on the first bid remaining in the hands of the Sheriff shall be returned to such first successful bidder within 45 days of the passing of title.
The Sheriff's Office has also prepared an informational sheet entitled "Monmouth County Foreclosure Procedures". This is *589 handed out to all prospective bidders prior to the auction sales on the advertised date. Yaniga and Marando received a copy.
The following provisions are pertinent to the issues at hand:
....
All sales are subject to a first mortgage, if any, and also any municipal, state or federal liens, if any. A title search will reveal this information and it is advised that this search be conducted prior to the purchase of any property as the purchaser must assume these liabilities. An attorney will be able to advise as to title search procedure.
....
At the time of the sale, the attorney for the Plaintiff will open the bidding at $100 and the bidding will continue until the highest bid is reached. The highest bidder will be the purchaser and shall produce 20% of his bid as deposit in cash or certified check and the balance will be due in 30 days. The Plaintiff's attorney normally does not allow the bid to go for less than the judgment amount due his client, which is the approximate amount advertised in the newspaper, and he will bid until he has reached this amount. At this point he may stop bidding and the highest bidder thereafter will be considered as the purchaser.
If for any reason the purchaser refuses to pay the balance of his bid within the 30 day period allowed him after the sale, the property will be readvertised and resold at the purchaser's expense. These costs will be deducted from the purchaser's deposit and the balance will be returned to the bidder.
....
These parties, admittedly, could not gather the funds required to complete the purchase. They so advised the Sheriff and requested return of their deposit. He has refused to do so having been advised by First Fidelity's lawyer that the bank would contest the turnover. Yaniga and Marando then sought legal advice and started suit against the Sheriff.
While the question of return of that deposit was pending, the sale of the property was readvertised. On August 13, 1990, the property was struck off to Marjorie and Bernardo Pagan on their bid of $125,000. They dutifully paid the deposit of $25,000 and signed the conditions of sale.
The Pagans were absolute neophytes in the business of buying interests at Sheriff's sales. They saw the Sheriff's *590 advertisement in the local newspaper. They were looking to buy a home and the property advertised was of interest to them. They caused no title search to be made. Had they done so they would have discovered that the property was encumbered by a first mortgage of approximately $40,000.00 held by First Savings & Loan Association of Bayonne and that the successful bidder at the sale would necessarily take title subject to it.
The Pagans had been given a copy of the same "Monmouth County Foreclosure Procedures" and signed the same Conditions of Sale as detailed above for Yaniga and Marando.
Their position is detailed in the affidavit filed by Marjorie Pagan (not disputed by any other party hereto). It recites:
2. My husband and I learned of the pending sale of the subject premises as a result of a classified advertisement in the Asbury Park Press.
3. As a result of said advertisement, I called Michael Alfieri's[3] office to make inquiry concerning the sale of the property. I spoke to a woman named Sheila at that office on two occasions. I asked whether any other monies would be due in addition to the amount to be bid at the Sheriff's Sale. I was told that there could be Sheriff's fees and outstanding taxes due but was never advised that the successful bidder would be responsible for the first mortgage. We were led to believe that the first mortgage would be paid out of the monies paid at the Sheriff's Sale.[4]
4. It was my first time taking part in a Sheriff's Sale and if I knew that the first mortgage would have to be paid in addition to our bid, we would have tailored our bid accordingly.[5]
5. On August 13, 1990, my husband and I appeared at the Sheriff's Office for the sale of the subject property. I was still not aware that the successful bidder would be responsible for the prior mortgage.
6. The bidding took place. There was myself and another bidder and my bid of $125,000.00 was the successful bid. As I was walking over to the Sheriff's Officer, after the bidding was completed, I was advised for the first time by a *591 person who I believe was the attorney for the mortgage holder, that there was a first mortgage and I would be responsible for the same. When I was told of the existence of this mortgage and the amount of the mortgage, I immediately realized that the house would cost me much more than I was prepared to bid or that I could afford.
7. After realizing the error that was made, I went to the Sheriff's Officer and told him that I could not go through with the purchase. I further advised him that I had been misinformed by the attorney's office and that I did not want to give them a deposit. At that time, several members of the Sheriff's office told me that I had no choice but to give them the deposit and that I would be in a lot of trouble if I didn't. My husband and I were panicked at that moment as we could not afford the house and could not afford to lose the deposit. However, we were told we had no choice and therefore we gave them the deposit.
The Pagans then sought the advice of Mr. Schwartz. His inquiry of the Sheriff revealed that the Sheriff was willing to return the $25,000 deposit less the cost of advertising and readvertising the sale but for the fact that First Fidelity Bank, as holder of the third mortgage (and beneficiary of the surplus) objected to that course.
The Sheriff again advertised the property for a third time. On October 15, 1990, First Fidelity Bank, the third mortgagee, bid the property in for the sum of $63,000.
Mr. Dreskin, attorney for First Fidelity Bank, represented it at each of the three sales. It was he who told the Pagans that there was a first mortgage on the property.
By agreement, the two applications for return of bid deposits were consolidated for legal argument and decision.
It is obvious that the exculpatory language contained in the Conditions of Sale and in the "Monmouth County Foreclosure Instructions" prepared by the Sheriff[6] is the cause of the problems presented. Without that language the rights of all parties concerned would be governed by existing statutory and case law.
*592 By virtue of N.J.S.A. 2A:17-1, the Sheriff is a proper person to whom a writ of execution may be directed for the purpose of levying upon and selling property. In so doing he must comply with the advertising requirements of N.J.S.A. 2A:61-1. However, neither of those laws regulate the conditions which a Sheriff may place on his sales. Fidelity Union Bank v. Trim, above, 210 N.J. Super. at 479, 510 A.2d 98.
In conducting an execution sale, a Sheriff is empowered to act as a public auctioneer. The purpose of the sale is to obtain the highest price for the benefit of the foreclosing mortgagee, other junior lien holders and, perhaps, the owner-mortgagor. Froehlich v. Walden, 66 N.J. Super. 390, 169 A.2d 204 (Ch.Div. 1961). A Sheriff's sale is serious public business. Arbitrary conditions and "local" rules should have no place in the process. As with any auction, the high bidder is awarded the property based on his promise to pay and the making of the required deposit as security for compliance. If he does not pay he has breached his contract. For that breach, just as with any breach of contract, he is liable to pay money damages. How are those damages to be evaluated? By a resale. 7 Am.Jur.2d 402-3, Auctions and Auctioneers §§ 48, 49.
Should the high bidder at a Sheriff's sale default, the sheriff must readvertise the sale. Stuart v. Gay, 127 U.S. 518, 8 S.Ct. 1279, 32 L.Ed. 191 (1888); Carmen v. Mayhew, 129 U.S. 73, 9 S.Ct. 246, 32 L.Ed. 608 (1889); Townshend v. Simon, 38 N.J.L. 239 (Sup.Ct. 1876). See also Bailey v. Dalrymple, 47 N.J. Eq. 81, 19 A. 840 (Ch. 1880) and Smith v. Cunningham, 69 N.J. Eq. 622 (Ch. 1905).
The measure of damages is the deficiency between the bid at the second sale and the bid at the first, plus the costs of the first sale including the sheriffs fees for that sale. To the extent of such deficiency, the foreclosing mortgagee has a cause of action for damages. Depending on the magnitude of the deficiency, holders of junior liens and the mortgagor may also have a cause of action against the first defaulting bidder. *593 The good faith deposit placed by that bidder with the Sheriff then is liable for those first sale costs and fees with any balance payable to the mortgagee in satisfaction (in whole or in part) of the damage claim. Winants v. Traphagen, 66 N.J. Eq. 455, 59 A. 164 (E. & A. 1904).
What this Sheriff has done by adding the Third condition of sale noted above is to emasculate the whole process. There is nothing final about such a sale. It encourages reckless bidding without the immediate wherewithall to pay. There is nothing to lose in "taking a flyer" but the costs of advertising. The bidder is not entering into an enforceable contract to purchase but rather is merely taking an "option" on the property.
The mischief caused by such a condition is evident here. The Final Judgment in Foreclosure entered on December 15, 1988 fixed the amount due to Investors and Lenders at $23,719.22, plus costs of $603.05. The Writ of Execution directed the Sheriff to sell the property and from the proceeds turn over that amount plus interest to Investors and Lenders. The first sale (after various delays) was held on February 26, 1990. The amount bid was $88,000. Had Yaniga and Marando fulfilled their bid, Investors & Lenders would have been paid off; First Fidelity would have been paid off and the balance (after deducting Sheriff's fees) would have been deposited with the Clerk of the Superior Court awaiting application of junior lien holders and the former owner. In permitting the bidders to withdraw from their bid, the Sheriff completely changed the result for the lien holders. They received nothing. But for the Sheriff's condition they would have not only a damage claim against Yaniga and Marando  easily calculated  but also a fund at hand (the deposit) from which the damage claim could have been partially satisfied.
The Sheriff readvertised. The purpose of the second sale was again, to obtain satisfaction for the foreclosing mortgagee (and junior lien holders) and depending on the amount bid the *594 second time, to determine the extent of the damage claim, if the second sale resulted in a lower bid.
The second sale occurred on August 13, 1990. $125,000 was bid. Had the Pagans fulfilled their bid the debt of Investors and Lenders would have been satisfied as would that of First Fidelity. Yaniga and Marando would not be exposed to a damage claim. They would have been entitled to return of their $21,000 deposit less costs associated with the first and second sales. Again, the Sheriff's condition advising that the deposit would be returned save only nominal costs, completely changed the result. Investors & Lenders and First Fidelity received nothing.
The Sheriff tried again. On October 15, 1990 the property was struck a third time  to First Fidelity on its bid of $63,000. That amount was necessary to protect its third mortgage against outside bidders and represents the total of the amounts due, (with interest) on the foreclosed second mortgage and First Fidelity's third mortgage.
If the deposits are returned (less nominal costs) the unqualified bidders escape unharmed. The debt of Investors & Lenders has been paid. First Fidelity, instead of being paid off, has had to pay off Investors & Lenders and ends up with title to the property subject to the $40,000 first mortgage of First Savings & Loan Association of Bayonne. That mortgage was the subject of a separate foreclosure action. As owner, First Fidelity must deal with that foreclosure, obtain possession of the premises; ascertain what repairs are necessary to place the property in condition for resale; pay taxes, insurance and other charges; attend to resale.
All parties seek to support their positions by citing Credit Alliance Corp. v. Ingram & Sons, Inc., 116 N.J. Super. 497, 282 A.2d 788 (Law Div. 1971). In that case Credit Alliance obtained a judgment of $7,063.53 against Ingram & Sons. Under a writ of execution the Sheriff of Monmouth County (a predecessor of the incumbent) levied upon real estate of the *595 defendant and sold it on June 7, 1971 to General Modular Development Corp. on its bid of $8,000. It deposited $2,800; signed conditions of sale and then defaulted in paying the balance. A second sale was held on August 9, 1971. The property was struck off to Credit Alliance, the sole bidder, for $100. After deduction of his fee and expenses from the deposit of $2,8900, the Sheriff retained $2,513.74. On application, the court ordered the Sheriff to turn that sum over to Credit Alliance  despite the fact that the conditions of that 1971 sale contained the same Third condition as that which plays the key role herein.
The court in Credit Alliance relied on Smith v. Cunningham, above. In that 1905 Chancery case the conditions of sale required the successful bidder to pay a deposit of 20% of the bid and sign the conditions of sale. The Fourth condition was as follows:
Fourth. Any person or persons purchasing at this vendue and not complying with the foregoing articles and conditions, the property so struck off and sold to him or them will be offered for sale a second time, and the first purchaser or purchasers to reap no benefit therefrom, but be held answerable for all loss and expenses occasioned thereby.
The condition in Smith v. Cunningham was quite different from that in this case (and in Credit Alliance Corp. v. Ingram & Sons, Inc.) The 1905 condition warns bidders of the consequences of a default. The Monmouth County Sheriff's conditions tells bidders that they have little to fear if they default. The legal underpinning for the holding in Credit Alliance is suspect.
Counsel for the Sheriff advises that a survey of the Sheriffs of the twenty-one counties indicates that some have a condition of sale forfeiting[7] the deposit on failure to pay the balance due; others, as here, use a condition which returns the deposit less costs.
*596 As Fidelity Union v. Trim, above makes clear, the conditions which each individual Sheriff places on a sale conducted by him are within his discretion. There is no legislative control. Case law directs that courts not interfere with the Sheriff's reasonable exercise of discretion. Merwin v. Smith, 2 N.J. Eq. 182, 196 (Ch. 1839). However, where "the manner of sale is so palpably injudicious as amounts to abuse of trust, it is a fraud upon the rights of the parties interested" which allows judicial interference to prevent such abuse. Parkhurst v. Cory, 11 N.J. Eq. 233, 237 (Ch. 1856).
The condition the Sheriff of Monmouth County uses is certainly injudicious. It undercuts the certainty of the public bidding process and obviously discourages realistic bids from serious contenders. There is a justifiable fear on their part that the uninformed neophyte with nothing to risk may be pushing the bid to unrealistic levels. No one is sure, after such a sale, whether anything substantive has been accomplished. That being said, this court is not prepared to equate the condition with an "abuse of trust". Instead, having delineated out the problem, its solution is left to the presumed good sense of the sheriff, in the first instance.[8] The legislature has done nothing to standardize conditions of sale among the 21 counties since enacting the predecessor of N.J.S.A. 2A:61-1 in 1799.
While the foregoing may be the better way, it does not control the reality of this case. The conditions of sale prepared by the Sheriff and signed by the bidder constitute the contract of sale. The Sheriff acts as the public auctioneer for the judgment creditor. If the judgment creditor believes those conditions detrimental to his legal interests, he has a right, presale, to apply to the court which issued the writ of execution, to *597 order the Sheriff to alter the offending conditions. But unless that is done, the contract is struck between Sheriff and bidder on the Sheriff's terms. Here, neither bidder can be held to a condition other than that agreed to. In each case the bid must be refunded less "the expenses of the first sale (as well as the second sale)." As to Yaniga and Marando this amount would consist of the advertising of the first sale and the advertising of the second sale. As to the Pagans, deducted from their deposit would be the advertising for the third sale.
Despite the return of the deposits First Fidelity may well have a damage claim against the Pagans or Yaniga and Marando  or both. This court does not intimate an opinion in that regard. However, it has no right to the deposit monies themselves.
After ascertaining the proper calculations from the Sheriff, Mr. Dato and Mr. Schwartz will submit appropriate orders for return of the balance of the deposits of their respective clients.
NOTES
[1] Fidelity Union Bank v. Trim, 204 N.J. Super. 434, 499 A.2d 245 (Ch.Div. 1985), rev. 210 N.J. Super. 476, 510 A.2d 98 (App.Div. 1986); The Howard Savings Bank v. Sutton, 246 N.J. Super. 482, 587 A.2d 1335 (Ch.Div. 1990).
[2] The amount of deposit was miscalculated by the Sheriff's Office on the mistaken notation that the bid had been $84,000.
[3] He is the attorney for Investors & Lenders, Inc.
[4] There is no factual support for this conclusory statement.
[5] This is belied by the attorney for First Fidelity Bank who states that he attended all three sales and that before each he heard the representative of Investors & Lenders state that the sale was subject to a first mortgage on the property.
[6] This Sheriff's Conditions of Sale were the root cause of the problem in Fidelity Union Bank v. Trim, above; in Howard Savings Bank v. Sutton, above, and in this court's unreported decision in Eastman v. Siderman, January 9, 1989 (a decision of which the Sheriff was fully cognizant.)
[7] "Forfeiture" is not the correct word. The holding of the deposit as a fund from which a damage claim can be satisfied is the better equitable concept. Bailey v. Dalrymple, 47 N.J. Eq. 81, 19 A. 840 (Ch. 1880).
[8] The simplest condition would be one which advises the bidder that failure to complete the contract by paying the balance due would result in the retention of the deposit. The sheriff would be entitled to deduct the advertising charge and his fees and then remit the balance to the clerk of the court  there to await application for turnover of an interested party.