**In re Anna L. TOWNSVILLE, Debtor.**

**No. 00–19680DWS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Oct. 3, 2001.

**98**

Marion Nowell, Philadelphia, PA, for debtor/plaintiff.

Joseph F. Riga, Maple Shade, NJ, for Bankers Trust of CA.

Joseph DiGiuseppe, Deputy City Solicitor, Philadelphia, PA, for John D. Green.

Edward Sparkman, Philadelphia, PA, Chapter 13 Trustee.

### OPINION

DIANE WEISS SIGMUND,
Bankruptcy Judge.

Before the Court are the following: (i) objection ("Claim Objection") by Bankers Trust of California, N.A. ("Bankers") to the "Proof of Claim Filed by Debtor on Behalf of Bankers Trust of Cal. N.A., Trustee, Pursuant to Bankruptcy Rule 3004" (the "Proof of Claim"); (ii) request of Anna Townsville ("Debtor") for confirmation of her First Amended Chapter 13 Plan ("Amended Plan"); and (iii) Bankers' objection ("Plan Objection") to Debtor's Amended Plan. Upon consideration of the evidence presented and applicable law, I grant Bankers' objections and deny Debtor's request for confirmation.

### BACKGROUND

Debtor resides at 1228 E. Mt. Airy Avenue in Philadelphia, Pennsylvania (the "Residence") with her granddaughter. Debtor has lived in the Residence for approximately 40 years.

In March of 1999, Bankers obtained a default judgment in mortgage foreclosure against Debtor in the amount of $25,398.09 based on a mortgage (the "Mortgage") for the Residence, dated October 6, 1995, between Debtor and Colonial National Bank USA ("Colonial"), and a Corporation of Assignment Mortgage, dated November 19, 1998, which assigned the Mortgage from Colonial to Bankers.[1] See Exhibit B–2 (Mortgage); Exhibit B–3 (Corporation of Assignment Mortgage); Exhibit D–1

---

**1.** As of the date of the assignment, Colonial had changed its name to Advanta National Bank.

¶¶ 1–3. The mortgage secured repayment of a Note ("Note") also dated October 6, 1995. The Note required Debtor to repay a loan of $23,500 with interest at the yearly rate of 11.450%, by making monthly payments of $273.78 commencing November 15, 1995, with the full debt, if not paid earlier, due and payable on October 15, 2010. *See* Note ¶ 3; Mortgage at 1. In the Note, this date (October 15, 2010) is referred to as the "Maturity Date" of the loan.[2] The evidence in the record fails to describe or identify the default which served as the basis for Bankers' foreclosure action.

On May 13, 1999, Debtor filed a Voluntary Petition for Relief under Chapter 13 of the Bankruptcy Code.[3] This bankruptcy case (the "First Bankruptcy Case") was dismissed on December 23, 1999. Thereafter, Bankers scheduled a sheriff's sale (the "Sheriff's Sale") for the Residence on April 4, 2000. On January 20, 2000, Debtor was served with notice of the sale. *See* Exhibit B–4 (Affidavit of Service).[4]

On March 28, 2000, Debtor filed another Chapter 13 bankruptcy case (the "Second Bankruptcy Case."). On April 4, 2000, Bankers' attorney, Terrence McCabe, Esquire, attended the scheduled Sheriff's Sale and, in light of the Debtor's Second

Bankruptcy Case, requested a postponement or continuance "to the July sale." Transcript, dated May 29, 2001 ("N.T. 5/29") at 19–20. Based on this request, the Sheriff announced the postponement to the July sale to be held on July 11, 2000. *Id.* at 20–21. *See also* Debtor's Brief at 5 ("At the request of Bankers Trust's attorney, the sale was postponed to July 11, 2000.").

On June 12, June 19 and June 26, 2000, the Sheriff's Office had notices placed in the Legal Intelligencer regarding properties to be sold by the Sheriff. On each of the aforementioned dates, the title of the notice is "Sheriff's Sale Notices for July 11, 2000." *See* Exhibit D–7, D–8 and D–9. Immediately below this title is a list of properties, one of which is Debtor's Residence. However, throughout each of the notices, there are repeated references to the Sheriff's Sale being held on June 6, 2000.[5] In the section of the notices which lists properties that were originally scheduled for sale on April 4, 2000, the notices state:

> The following property, sale of which was postponed from the April 4, 2000 Sheriff's Sale will be offered for sale on June 6, 2000
>
> \*　　\*　　\*　　\*　　\*　　\*

---

**2.** While neither party sought to include in the record a payment schedule for the loan showing the date of the last payment due under the terms of the Note, using a basic loan calculator, a loan of $23,500 at an interest rate of 11.450% with monthly payments of $273 .78 would be paid in full in October of 2010, which is consistent with the Maturity Date of the Note.

**3.** I shall take judicial notice of the docket entries and the claims register report in this case. Fed.R.Evid. 201, incorporated in these proceedings by Fed.R.Bankr.P. 9017. *See Maritime Elec. Co., Inc. v. United Jersey Bank,* 959 F.2d 1194, 1200 n. 3 (3d Cir.1991); *Levine v. Egidi,* 1993 WL 69146, at \*2 (N.D.Ill. 1993); *In re Paolino,* 1991 WL 284107, at \*12

n. 19 (Bankr.E.D.Pa.1991); *see generally In re Indian Palms Associates, Ltd.,* 61 F.3d 197 (3d Cir.1995).

**4.** Debtor testified that she did not receive notice of the April 4th Sheriff's Sale and that she does not remember whether she was served with papers on January 20, 2000. While I do not doubt that Debtor does not now recall receiving notice of the April 4th Sale, I find the Affidavit of Service which was completed within days of January 20, 2000 to be reliable evidence of whether Debtor was served with notice of the April 4th Sale.

**5.** Significantly, June 6, 2000 had already passed when the notices appeared in the Legal Intelligencer on June 12, 19 and 26, 2000.

373

1228 E. Mt. Airy Ave. 50th Wd on the Southeasterly side of Mt. Airy Ave. 401 ft. 6 in. Southwesterly of Thoroun Ave. Frt: 113 ft. 4–7/8 in. Depth: 16 ft. 2 in. regularly Shaped Subject to Mortgage Anna L. Townsville C.P. January Term, 1999 No. 1831 $25,398.09 Terrence J. McCabe, Esquire.

*Id.* The cost of listing Debtor's Residence in these notices was added to the foreclosure judgment against the Debtor. N.T. 5/29 at 47, 68. The record contains no evidence regarding the amount of the cost.

On July 3, 2000, Debtor's Second Bankruptcy Case was dismissed. On July 11, 2000, Debtor's Residence was sold at the Sheriff's Sale to Bankers as the highest bidder for $50,000. *Id.* at 21. Of this amount, Bankers has paid deposits totaling $5,527.00.[6] *Id.* at 54. On August 4, 2000, Debtor filed the instant bankruptcy case (the "Third Bankruptcy Case"). As of that date, Bankers had not paid the balance of the $50,000 which it owed to the Sheriff's Office for the sale of the Residence and, consequently, the Sheriff had not issued, acknowledged, recorded or delivered a deed for the Residence to Bankers. *Id.* at 55, 82–83. There is no evidence or claim that Bankers is unable or unwilling to complete the purchase by paying the balance of the $50,000 purchase price.

According to the distribution policy which the Sheriff's Office obtained in connection with the sale of the Residence, in the event the sale is completed, the Sheriff would make the following distributions to third parties from the proceeds of the sale: (i) $6,094.73 to the City of Philadelphia for delinquent real estate taxes; (ii) $639.26 for water rents; and (iii) $12,489.52 to PGW. N.T. 5/29 at 58, 73, 80–81. However, the City has stipulated that the Debtor does not owe any real estate taxes on the Residence.[7] *Id.* at 107–08. Moreover, according to the Debtor's Schedules, the debt owed to PGW is an unsecured claim. *See* Exhibit D–10, Schedule F.[8]

On August 18, 2000, Debtor filed her Chapter 13 Plan (the "Plan"). She included the following pertinent provisions in the Plan regarding Bankers' foreclosure judgment and the Sheriff's Sale:

4. The various claims of the debtor's creditors shall be classified as follows:

\* \* \* \* \* \*

c. *CLASS 3*—The claim, filed and allowed, by Bankers for the total unpaid balance due on its judgment in mortgage foreclosure as determined by the court to the extent the allowed claim is a secured claim, within the meaning of 11 U.S.C. § 506(a), secured by a lien on the debtor's interest in 1228 E. Mt. Airy Ave., Philadelphia, PA 19150 which is not void or avoidable under the provisions of the Bankruptcy Code. It is

---

6. The deposit of $5,527.00 included a $2,000 deposit that was made at the time the writ was taken to the Sheriff's Office and a $3,527.00 payment that was made at the time of the Sheriff's Sale. N.T. 5/29 at 54.

7. Joseph DiGiuseppe, Esquire stipulated to this fact on behalf of the City at the hearing on May 29, 2001. N.T. 5/29 at 107–08. Interestingly, the Claims Register, of which I take judicial notice, *see supra* at n. 3, lists a secured claim by the City of Philadelphia Law Department Tax Unit for $395.76. The Claims Register also lists a secured claim filed by the City of Philadelphia Department of Water Revenue for $1,174.67.

8. On Schedule F, Debtor listed PGW as having an unsecured claim of $12,500. According to the Claims Register, PGW filed a secured claim in the amount of $14,221.80 on September 4, 2001.

anticipated that Bankers's lien will be disallowed by the Court as Debtor is attempting to rescind Bankers's mortgage due to its violations of the PA Unfair Trade Practices Act and of the Truth–in–Lending Act and other federal and state consumer protection laws. It is anticipated that as of the effective date of the debtor's plan, the unpaid balance of Bankers's allowed secured claim, if any, secured by a lien on the debtor's interest in her home, will be less than $20,000.00.

\* \* \* \* \* \*

5. The payments received by the trustee from the debtor pursuant to its plan shall be distributed as follows:

\* \* \* \* \* \*

c. *CLASS 3 CLAIMS:* Payments shall be made by the trustee to the holder of the Class 3 claims. However, to the extent the claim is a secured claim within the meaning of 11 U.S.C. § 506(a), secured by a lien on the debtor's interest in 1228 E. Mt. Airy Ave., Philadelphia, PA, which is not void or avoidable, the holder of the claim shall retain its lien, to the extent it is not void, avoided, or subject to avoidance under 11 U.S.C. § 506(d) or any other provisions of the Bankruptcy Code, and shall receive payments directly from the Debtor pursuant to paragraph 10 below and consistent with the Debtor's rescission plan.

\* \* \* \* \* \*

9. The debtor shall not make the regular monthly payments of principal and interest which may have been required under any mortgage which Bankers may have held. The debtor shall be paying off 100% in full of Bankers's allowed secured claim, if any, against debtor's interest in 1228 E. Mt. Airy Ave., and debtor shall be required to make no payments to Bankers other than those required by paragraph 10 below. It is specifically noted that no payments shall be made to reimburse for or to pay for any forced place insurance obtained by Bankers ...Nor are any payments to be made for Bankers['] costs or fees, including attorneys' fees, for the underlying mortgage foreclosure action and execution of the judgment as the underlying judgment and Sheriff Sale are void and/or voidable due, *inter alia*, to the lower court's lack of jurisdiction in entering the default judgment.

10. Commencing on the effective date of the plan:

a. the debtor shall pay through the Trustee to Bank [*sic*], monthly, the sum of $5.00 and, in addition, shall escrow with her attorney's office the sum of $375.00 monthly until the parties or the Court determine the amount of Banker's allowed secured claim, if any. At that time Debtor will cease escrowing and will commence paying her monthly payment directly to Bankers until the entire unpaid balance of the allowed secured Class 3 claim, if any, of Bankers is paid in full with simple interest on the unpaid balance of the allowed secured claim at the rate of 6% per annum, which interest will begin to accrue and will be calculated from the effective date of the plan.

b. The debtor's obligation to make payments under this plan commences within thirty days of the

filing of the Plan. Any payments made by the debtor to the trustee prior to the effective date, in order to comply with the requirements of 11 U.S.C. § 1326(a), shall be credited against the debtor's total obligation to the trustee under paragraph 3 of the plan.

c. It is anticipated that as of the effective date of the plan the total amount due to Bankers on its allowed secured Class 3 claim, if any, will be between $0.00 and $20,000.00.

Plan ¶¶ 4–5, 9–10.

On August 29, 2000, the First Meeting of Creditors was scheduled for October 25, 2000 and January 23, 2001 was set as the last date for filing claims. On September 14, 2000, Debtor filed an adversary proceeding (the "Adversary Proceeding") against Bankers, John D. Green ("the Sheriff") as the Sheriff of Philadelphia County and the Chapter 13 Trustee seeking, *inter alia*, (i) a declaration that the Sheriff's Sale is void due to alleged violations of the automatic stay by Bankers and the Sheriff (collectively referred to hereinafter as "Defendants"); (ii) a declaration that Defendants were in contempt of court in "failing to void the judgment"; and (iii) an award of nominal and punitive damages against Defendants for violating the automatic stay and being in contempt. *See* Counts I & III of Exhibit D–12 (Complaint).[9]

On March 1, 2001, Debtor filed the Proof of Claim for Bankers, listing the amount of its claim as $1.00. *See* Exhibit D–1. The Proof of Claim states, in relevant part:

3. A judgment in mortgage foreclosure was entered on the underlying Mortgage on March 12, 1999, in the amount of $25,398.09, but the judgment is void, or voidable.

4. Total amount of the Secured Claim at the Time the Case Was Filed: At most $1.00, after application of all defenses, credits and set offs.

5. The claim is secured by the debtor's interest in her home located at 1228 East Mt. Airy Avenue, Philadelphia, PA 19150. The claim is a secured claim.

6. There is no unsecured priority claim.

7. The amount of all payments on this claim, as well as set offs and defenses have been credited and deducted for the purpose of making this claim. After application of all set offs and defenses, there are no arrears due on this claim.

Exhibit D–1.

On March 9, 2001, Debtor filed her Amended Plan which requires her to pay to the Chapter 13 Trustee $5.00 per month from the 1st through the 60th month of the plan for a total of $300.00. Exhibit D–3. The Amended Plan also provides for Debtor to pay $375.00 per month directly to Bankers, commencing on the effective date of the Amended Plan, which is defined as "April 5, 2001 or the date the order of confirmation is entered of record by the court, whichever is later" until the entire balance of Banker's allowed secured claim is paid in full with "simple interest on the unpaid balance" at the rate of 6% per annum. *Id.* Paragraphs 9 and 10 of the Amended Plan further provide, in pertinent part:

9. Pursuant to 11 U.S.C. § 1322(b)(7), Debtor rejects any executory contract for the purchase of her home at 1228 E. Mt. Airy Ave., Philadel-

---

9. In the Complaint, Debtor also seeks: (i) a declaration that the Sheriff's Sale is void "because the underlying judgment in mortgage foreclosure is void"; and (ii) a declaration that Debtor's due process rights were violated and that such violation caused her compensable damages. *See* Counts II & IV of Exhibit D–12 (Complaint).

phia, PA 19150 with Bankers that may have been created by the sheriff sale which took place on July 11, 2000. Any allowed secured claim which Bankers may have as a result of such rejection pursuant to 11 U.S.C. § 365(j) shall be treated as part of any filed and allowed secured Class 3 claim which Bankers may have.

10. The debtor shall not make any regular monthly payments of principal and interest which may have been required under any mortgage which Bankers holds, held or may have held on 1228 E. Mt. Airy Avenue. The debtor shall be paying off 100% of Bankers' allowed secured claim, if any, secured by an interest in Debtor's interest in 1228 E. Mt. Airy Avenue, Philadelphia, PA 19150[.]

Amended Plan ¶¶ 9–10. Moreover, paragraph 13(c) of the Amended Plan states:

It is anticipated that as of the effective date of the plan the total amount due to Bankers on its filed and allowed secured Class 3 claim, if any, will be between $0.00 and $20,000.00.

Amended Plan ¶ 13(c).

According to Debtor's Schedules, her monthly income is $895.00. *See* Exhibit D–11, Schedule I. Her monthly expenses are listed as $850.00 which includes the $5.00 monthly payment to the Trustee and the $375.00 monthly escrow payment to her counsel provided under the terms of her Amended Plan. *See id.,* Schedule J.

On March 19, 2001, Bankers filed its Claim Objection and Plan Objection. On April 4, 2001, Bankers filed an amended objection to the Proof of Claim, raising

timeliness as an additional basis for objecting to the Proof of Claim.

At the evidentiary hearing on the instant matters, the following four witnesses testified: (i) Terrence McCabe, Esquire who was the attorney representing Bankers in the foreclosure proceeding against the Debtor and at the time of the Sheriff's Sale; (ii) Jedelle Baxter, Jr., an Administrative Captain with the Philadelphia Sheriff's Office; (iii) James Davis who signed the Affidavit of Service attesting that he served the Debtor on January 20, 2000; and (iv) Debtor who testified telephonically.

At the hearing, the parties also submitted a Stipulation of Facts which states, in pertinent part:

1. [Debtor's] Ch. 13 plan provides that she pay $5.00 per month to the Trustee, beginning on or about September 14, 2000.

2. The Trustee Report of 6/14/00 shows that the Trustee received no payment in April, 2001 or May, 2001 but did receive a June, 2001 payment. . . .

3. [Debtor's] counsel, Marian C. Nowell, Esq., is holding two Trustee payments totaling $10.00 that will be delivered to the Trustee on Monday, June 18, 2001.

4. As of Monday, June 18, 2001, [Debtor's] plan payment delinquencies have been cured and [Debtor's] proposed plan payments are current in accordance with her proposed plan.

5. Since September, 2000, in accordance with her Ch. 13 plan, [Debtor] has paid a monthly sum into her escrow account held by her attorney's office at Philadelphia Legal Assistance.[10] Her monthly pay-

---

10. Both the terms of Debtor's original Plan and her Amended Plan require Debtor to pay

$375.00 per month to Bankers commencing on the "effective date of the plan." While

ment, according to her plan, is $375.00.

6. On Monday, June 18, 2001, [Debtor] paid a sum toward her proposed June 2001 escrow payment. She paid $275.00, $100 less than provided for in her proposed plan.

7. As of Monday, June 18, 2001, the total amount in [Debtor's] escrow account at Philadelphia Legal Assistance is $3,629.00.

Stipulation of Facts. Subsequent to the hearing, both the Debtor and Bankers submitted briefs. *See* Debtor's Brief in Support of Confirmation of Debtor's First Amended Chapter 13 Plan and in Opposition to the Objection of Bankers Trust to Proof of Claim Filed by Debtor on its Behalf Pursuant to 11 U.S.C. § 501(c) ("Debtor's Brief"); Memorandum of Law of Bankers Trust of California, N.A., Trustee in Opposition to Debtor's First Amended Plan and in Support of its Objection to Proof of Claim Filed by Debtor Ostensibly on Behalf of Bankers Trust ("Bankers' Brief").

**DISCUSSION**

### I. *PROOF OF CLAIM*

Debtor filed the Proof of Claim on Bankers' behalf pursuant to 11 U.S.C.

§ 501(c) and Fed.R.Bankr.P. 3004. *See* Exhibit D-1. Bankers objects to it as untimely.[11]

Section 501(c) states:

If a creditor does not timely file proof of such creditor's claim, the debtor or the trustee may file a proof of such claim.

11 U.S.C. § 501(c). Rule 3004 provides, in pertinent part:

If a creditor fails to file a proof of claim on or before the first date set for the meeting of creditors called pursuant to § 341 of the Code, the debtor or trustee may do so in the name of the creditor, within 30 days after expiration of the time for filing claims prescribed by Rule 3002(c)[.] ... A proof of claim filed by a creditor pursuant to Rule 3002 ... shall supersede the proof filed by the debtor or trustee.

Fed.R.Bankr.P. 3004. In the instant case, "30 days after expiration of the time for filing claims prescribed by Rule 3002(c)" was February 22, 2001.[12] Since the Proof of Claim was not filed until March 1, 2001, Bankers correctly asserts that it was not timely filed. Debtor does not dispute these dates. Instead, she argues that her original Chapter 13 plan "served the purpose of an informal proof of claim" and

---

Debtor's original plan does not define such date, the provisions thereof, when read together, suggest that the "effective date of the plan" was the filing date which was August 18, 2000. *See* Plan ¶¶ 3, 10. In contrast, as noted above, *supra* at 103, the "effective date of the plan," under the Amended Plan is defined as "April 5, 2001 or the date of the order of confirmation is entered of record by the court, whichever is later." Amended Plan ¶ 12.

11. Bankers also objects to the Proof of Claim on the following grounds: (i) the Proof of Claim was signed by Debtor's attorney and not Debtor; and (ii) Bankers owns the Residence as a result of the Sheriff's Sale and, therefore, Debtor cannot interfere with Bank-

ers' property rights by filing a claim on its behalf. Because I find merit in Bankers' argument that the Proof of Claim was not timely filed, I need not address these arguments.

12. Rule 3002(c) states, in relevant part:

In a ... chapter 13 individual's debt adjustment case, a proof of claim is timely filed if it is filed not later than 90 days after the first date set for the meeting of creditors called under § 341(a) of the Code[.]

Fed.R.Bankr.P. 3002(c). In this case, the "first date set for the meeting of creditors" was October 25, 2000. Ninety days thereafter was January 23, 2001. Thirty days from January 23, 2001 was February 22, 2001.

that her later filed formal Proof of Claim was an amendment to the earlier informal proof of claim. Debtor's Brief at 25.

■ The informal proof of claim doctrine "is an equitable principle developed by the courts to alleviate the harsh results of strict enforcement of the bar date." *Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.)*, 190 B.R. 185, 187 (Bankr.S.D.N.Y.1995). *See also Grubb v. Pittsburgh National Bank (In re Grubb)*, 169 B.R. 341, 348 (Bankr.W.D.Pa.1994) (*quoting In re Harper*, 138 B.R. 229, 237 (Bankr.N.D.Ind.1991)) ("The category of informal proofs of claim has developed because bankruptcy courts are courts of equity, and thus, must assure that 'substance will not give way to form, [and] that technical considerations will not prevent substantial justice from being done.'"). The doctrine "has been in existence for nearly a century." *Barlow v. M.J. Waterman & Associates, Inc. (In re M.J. Waterman & Associates, Inc.)*, 227 F.3d 604, 608 (6th Cir.2000). Historically, it has been applied to proofs of claim filed by creditors. *See id.* (emphasis added) ("[The doctrine] permits a bankruptcy court to treat the pre-bar filings of a *creditor* as an informal proof of claim which can be amended after the bar date so that it is in conformity with the requirements of Fed.R.Bankr.P. 3001(a)."); *Wright v. Holm (In re Holm)*, 931 F.2d 620, 622 (9th Cir.1991) (*quoting In re Anderson–Walker Indust., Inc.*, 798 F.2d 1285, 1287 (9th Cir.1986) (*quoting County of Napa v. Franciscan Vineyards, Inc. (In re Franciscan Vineyards, Inc.)*, 597 F.2d 181, 182 (9th Cir.1979))) (emphasis added) ("We have 'consistently applied the "so-called rule of liberality in amendments" to *creditors*' proofs of claim' so that the formal claim relates back to a previously filed informal claim."). *See also Dembo v. United States (In re Dembo)*, 126 B.R. 195, 199 (Bankr.E.D.Pa.1991) (emphasis in original) ("We believe that it

constitutes an unwarranted extension of the "informal proof of claim" doctrine to conclude that a pleading filed by a *debtor*, well aware of not only the desire to raise a claim but the formal claim process as well, can constitute an informal filing of a claim on behalf of a *creditor* who might not wish to make a claim against the estate."). *But see In re Babbin*, 156 B.R. 838, 853 (Bankr.D.Colo.1993) (granting Debtor's request to have Chapter 13 plan treated as an informal proof of claim on behalf of a creditor), *rev'd on other grounds*, 160 B.R. 848, 849 (D.Colo.1993). The reasons the doctrine has not been applied to debtors undoubtedly include the following: (i) as a practical matter, the vast majority of claims are filed by creditors and not debtors; and (ii) debtors who fail to file timely proofs of claim may move for an enlargement or extension of the applicable deadline under Rule 9006(b)(1).

■ Rule 9006(b)(1) states, in pertinent part:

> Except as provided in paragraphs (2) and (3) of this subdivision, when an act is required or allowed to be done at or within a specified period by these rules ..., the court for cause shown may at any time in its discretion ... on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.

Fed.R.Bank.P. 9006(b)(1). Debtors can utilize this rule to seek an extension of the deadline imposed on them by Rule 3004 for filing claims, but creditors who are subject to the time deadline under Rule 3002(c) for filing claims cannot. *See In re Branch*, 228 B.R. 831, 834 (Bankr.W.D.Va. 1998) (noting that "only the debtor and the trustee have the ability to extend the time limit" for filing claims under Rule 9006(b)). Instead, such creditors are limited by Rule

9006(b)(3) to the very narrow exceptions for granting an extension of the deadline for filing a claim listed in Rule 3002(c).[13] *In re Ford,* 205 B.R. 960, 967 (Bankr. N.D.Ala.1996) (only debtors and trustees may take advantage of court authorized extension of deadline for filing claims; creditors are not afforded the same opportunity for extension but instead are limited to the narrow exceptions provided in Rule 3002(c)); *In re Duarte,* 146 B.R. 958, 961–63 (Bankr.W.D.Tex.1992) (italics in original) (holding that while "late claims *can* be filed by *debtors* out of time upon a showing of excusable neglect ... Bankruptcy Rule 3002(c) is an absolute bar to late claims by creditors in chapter 13 cases, unless one of the ... exceptions contained in the Rule is met[.]"). Thus, while debtors and trustees in a Chapter 13 case have a vehicle under the Bankruptcy Code for seeking relief from a missed claim deadline, creditors do not unless they fit within one of the limited exceptions listed in Rule 3002(c).

■■ In the instant case, Debtor has not moved for an enlargement of the Rule 3004 deadline for filing claims. Rather than take this route, Debtor has moved to have her Chapter 13 Plan accepted as an informal proof of claim on behalf of Bankers. In so doing, she has offered no explanation for having failed to comply with the claims deadline imposed by Rule 3004.

"Whether an informal proof of claim should be allowed is an equitable determination by the Bankruptcy Court." *Barlow v. M.J. Waterman & Associates, Inc. (In re M.J. Waterman & Associates, Inc.),* supra, 227 F.3d at 607; *In re Wigoda,* 234 B.R. 413, 415 (Bankr.N.D.Ill.1999), *aff'd,* 11 Fed.Appx. 624, 2001 WL 599692 (7th Cir. May 25, 2001). *See also Grubb v. Pittsburgh National Bank (In re Grubb),* supra, 169 B.R. at 348 ("In this case, the equities of the situation do not warrant recognizing PNC's Motion for Relief as an informal proof of claim."). I conclude,

---

**13.** Paragraph (3) of Rule 9006(b) provides:

The court may enlarge the time for taking action under Rules 1006(b)(2), 1017(e), *3002(c)*, 4003(b), 4004(a), 4007(c), 8002, and 9033, only to the extent and under the conditions stated in those rules.

Fed.R.Bankr.P. 9006(b)(3)(emphasis added). Rule 3002(c) provides:

In a chapter 7 liquidation, chapter 12 family farmer's debt adjustment, or chapter 13 individual's debt adjustment case, a proof of claim is timely filed if it is filed not later than 90 days after the first date set for the meeting of creditors called under S 341(a) of the Code, except as follows:

(1) A proof of claim filed by a governmental unit is timely filed if it is filed not later than 180 days after the date of the order for relief. On motion of a governmental unit before the expiration of such period and for cause shown, the court may extend the time for filing of a claim by the governmental unit.

(2) In the interest of justice and if it will not unduly delay the administration of the case, the court may extend the time for filing a proof of claim by an infant or in-

competent person or the representative of either.

(3) An unsecured claim which arises in favor of an entity or becomes allowable as a result of a judgment may be filed within 30 days after the judgment becomes final if the judgment is for the recovery of money or property from that entity or denies or avoids the entity's interest in property. If the judgment imposes a liability which is not satisfied, or a duty which is not performed within such period or such further time as the court may permit, the claim shall not be allowed.

(4) A claim arising from the rejection of an executory contract or unexpired lease of the debtor may be filed within such time as the court may direct.

(5) If notice of insufficient assets to pay a dividend was given to creditors pursuant to Rule 2002(e), and subsequently the trustee notifies the court that payment of a dividend appears possible, the clerk shall notify the creditors of that fact and that they may file proofs of claim within 90 days after the mailing of the notice.

Fed.Bankr.R.P. 3002(c).

based on the record before me, that the equities of the instant situation do not support treating the Plan as an informal proof of claim.

In filing the Proof of Claim, Debtor listed the amount of Bankers' secured claim as $1.00. Based on the record before me, Debtor did not have a good faith basis for limiting Bankers' claim to this amount. The foreclosure judgment entered against Debtor was for $25,398.09. In addition, Bankers purchased the Residence at the Sheriff's Sale. In her Plan, Debtor stated that "[i]t is anticipated that Bankers's lien will be disallowed by the Court as Debtor is attempting to rescind Bankers's mortgage due to its violations of the PA Unfair Trade Practices Act and of the Truth–in–Lending Act and other federal and state consumer protection laws." Plan ¶ 4(c). Contrary to this representation, there is no evidence in the record that Debtor has ever taken any action to have Bankers' mortgage rescinded or to seek damages under any of the aforementioned consumer protection laws. Consequently, Debtor has no basis at this time for claiming any set-offs, defenses or deductions against Bankers based on any alleged violations of the Pennsylvania Unfair Trade Practices Act, the Truth–in–Lending Act or any other consumer protection law. As for the Adversary Proceeding which Debtor filed in September of 2000 with regard to the Sheriff's Sale, even if the Debtor succeeds in this proceeding such that the Sheriff's Sale is declared void and she is awarded monetary damages for her alleged violation of the stay, the mortgage foreclosure judgment for $25,398.09 would still exist and Bankers' claim against the estate would only be decreased by the amount of the damages, if any, awarded for the alleged stay violation.

Debtor attempts to minimize this point regarding Bankers' claim by asserting that if Bankers disagreed with the amount listed in the Proof of Claim, it could have filed a substitute claim to which Debtor could then have filed an objection. However, a review of Rules 3002 and 3004 of the Federal Rules of Bankruptcy Procedure indicates otherwise. According to Rule 3004, in order to file a superseding claim, Bankers would have had to comply with the bar date imposed in accordance with Rule 3002(c) which was January 23, 2001. *See* Fed.R.Bankr.P. 3004 ("A proof of claim filed by a creditor pursuant to Rule 3002 . . . shall supersede the proof filed by the debtor or trustee."). *See also In re Cook*, 205 B.R. 617, 622–23 (Bankr.N.D.Ala.1996) (holding that for any proof of claim filed by a creditor to supersede a claim filed by a debtor or trustee pursuant to Rule 3004, the creditor must file the claim within the time deadline imposed by Rule 3002(c)). Since Debtor did not file the Proof of Claim until March 1, 2001, Bankers could not meet the claims deadline imposed by Rule 3002. Moreover, as the above-stated discussion regarding Rule 9006(b) indicates, since Bankers does not fit within any of the exceptions set forth in Rule 3002(c)(1)–(5), it could not obtain an extension of the January 23, 2001 deadline. *See* Fed.R.Bankr.P. 9006(b)(3). *See also In re Moore*, 247 B.R. 677, 689 n. 10 (Bankr. W.D.Mich.2000) (*citing* Fed.R.Civ.P. 3004 & 9006(b)) (noting that "[a]lthough the time within which a debtor may file a protective claim may be enlarged by Rule 9006(b), the reciprocal right of a creditor to file its own superceding proof of claim may not be similarly enlarged."). Thus, Bankers could not file a superseding claim.

Instead of litigating any defenses, set-offs and/or deductions which she may have against Bankers, Debtor is seeking, by filing the Proof of Claim and seeking to have the Plan treated as an informal proof of claim, to do an end run around Bankers and force it to be treated as a secured

claimant with a mere $1.00 claim. I view this strategy as misguided and not deserving of the protection which equity can provide.

Furthermore, Debtor waited until past the eleventh hour to file the Proof of Claim and only asserted her contention that the Plan constitutes an informal proof of claim which is amended by her formal Proof of Claim after Bankers objected to the latter. Yet, she has offered no explanation whatsoever for her delay. In the absence of such an explanation, which would similarly be necessary under Rule 9006(b) to obtain an extension of the claims deadline imposed by Rule 3004, I find that it would be inequitable to apply the informal claims doctrine to treat the Plan as a claim filed by Debtor on Bankers' behalf. *See Grubb v. Pittsburgh National Bank (In re Grubb)*, 169 B.R. 341, 348–49 (Bankr. W.D.Pa.1994) (ruling that the equities of the situation did not warrant granting creditor's request to have its late filed claim treated as an amendment to its informal claim filed in the form of a motion for relief since creditor failed to provide the "court with a single reason that would justify a finding that its failure to file [a timely proof of claim] should be excused."). Bankers' Claim Objection shall be granted and the Proof of Claim shall be stricken.

## II. *CONFIRMATION*

Bankers objects to confirmation of the Amended Plan on the following grounds: (i) the Amended Plan treats Bankers as the holder of a secured claim despite its status as the purchaser at the Sheriff's Sale; and (ii) the Amended Plan treats Bankers as if it holds a "claim secured by collateral other than the Debtor's principal residence[.]" Objection to Confirmation ¶¶ 15–18. With respect to the first objection, Debtor contends that the Amended Plan properly treats Bankers as the holder of a secured claim because:

(i) the Sheriff's Sale is an executory contract which she has elected to reject pursuant to 11 U.S.C. § 1322(b)(7) and § 365(j), *see* Debtor's Brief at 19;

(ii) the Sheriff's Sale is an avoidable preference under 11 U.S.C. § 547, *see id.* at 16–17;

(iii) she is entitled to cure or pay off the underlying judgment which formed the basis of the Sheriff's Sale pursuant to 11 U.S.C. § 1322(c)(1) since: (a) the Sheriff's Sale had not been "completed" before she filed her bankruptcy case; and (b) the sale was not conducted in accordance with applicable non-bankruptcy law, *see id.* at 20–22; and

(iv) the Sheriff's Sale is void because Defendants violated the automatic stay by causing the notices of the sale to be placed in the Legal Intelligencer, *see id.* at 13–16.[14]

With regard to Bankers' second argument, namely that Debtor is improperly treating Bankers as if it holds a claim secured by collateral other than the Residence, Debtor contends that under the terms of the Mortgage, a security interest was taken not only in her Residence but also in funds ("Funds") which "were to be held in an insured account for the purpose of enabling Bankers to accrue funds for the

---

14. On pages 13–16 of her brief, Debtor also argues that the Sheriff's Sale must be set aside because proper notice of the sale was not given in accordance with Pa.R.C.P. 3129.3. In my discussion regarding 11 U.S.C. § 1322(c)(1), *see infra* at 48–52, I conclude that, on this record, Debtor has not established grounds for setting aside the Sheriff's Sale. Moreover, as Bankers points out in its brief, *see* Bankers' Brief at 11, Debtor has not filed a petition under Pa.R.C.P. 3132 to have the sale set aside and has not asked for such relief in the Adversary Proceeding.

payment of various expenses including taxes and assessments[,] ... hazard insurance, flood insurance, mortgage insurance, and payments in lieu of mortgage insurance." Debtor's Brief at 4–5. I address each of Debtor's arguments below.

### A. Whether the Sheriff's Sale is an Executory Contract

Debtor contends that she can reject the Sheriff's Sale of her Residence under 11 U.S.C. § 1322(b)(7) and 11 U.S.C. § 365(j) because it is an executory contract. Debtor's Brief at 19. An executory contract is " 'a *contract* under which the obligation of both the *bankrupt* and *the other party to the contract* are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.' " *Enterprise Energy Corporation v. United States (In re Columbia Gas System, Inc.)*, 50 F.3d 233, 239 (3d Cir. 1995) (*quoting Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir.1989)) (emphasis added). A contract is a "a promise or set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." *Pennsylvania Footwear Corporation v. Midlantic Bank (In re Pennsylvania Footwear Corporation)*, 204 B.R. 165, 175 (Bankr.E.D.Pa.1997). Debtor failed to cite any cases which support her contention that the Sheriff's Sale constituted or resulted in a contract between her and Bankers. My independent research failed to unveil any support for the contention under Pennsylvania law. *But see Federal Deposit Insurance Corporation v. Dye*, 642 F.2d 837, 844 (5th Cir.1981) (observing that "Georgia law treats the high bid at a foreclosure sale as forming a contract; the bidder contracts with the debtor to purchase the property at the bid price."). Rather, case law in Pennsylvania suggests that the duty of a purchaser at a Sheriff's Sale is to the sheriff alone. *Zwinger v. Keim*, 260 Pa. 62, 63–64, 103 A. 504, 504 (1918) ("Whether the sheriff will hold the purchaser to the strict compliance of the conditions of the sale or not is a matter between him and the purchaser, of which no one else can complain and least of all the defendant, whose duty it was to pay the judgment."); *Smith v. Wilson*, 152 Pa. 552, 553, 25 A. 601, 602 (1893) ("The liability of a defaulting purchaser for the loss on a resale of the property is to the sheriff, and the action to enforce it must be in his name."); *Hartman v. Pemberton*, 24 Pa.Super. 222, 1904 WL 3291 at *5 (1903) ("The right of action [against a purchaser for failure to complete a Sheriff's sale by payment of the balance of his bid] is in sheriff. The contract was with him, and he is responsible for the proper application of any amount recovered."). Consequently, I find no merit to Debtor's argument that a debtor's right to reject executory contracts affords her any relief from the Sheriff's Sale of her Residence.

### B. Whether the Sheriff's Sale Constitutes an Avoidable Preference under Section 547

Debtor contends that, based on the evidence that was produced at the hearing on this matter, she will be able to raise § 547 in the Adversary Proceeding which she previously filed as "an additional ground for avoiding the sale." [15] Debtor's

---

15. I note that on July 31, 2001, Debtor commenced an adversary proceeding against Bankers, the Sheriff, the City of Philadelphia Department of Water Revenue, the City of Philadelphia Department of Tax Revenue and the City of Philadelphia t/a Philadelphia Gas Works asserting claims based on 11 U.S.C. § 544(a)(3) and 11 U.S.C. § 547. She moved to consolidate this adversary proceeding with

Brief at 17. Elaborating on this point, Debtor asserts that "[t]he sheriff sale is an avoidable preferential transfer because it will result in the City of Philadelphia receiving approximately $20,000 more than it would receive in a liquidation." *Id.* Explaining the basis of this assertion, Debtor states:

> The City stipulated at the confirmation hearing that it is owed no taxes on the Debtor's home, either past or current. Yet, the Sheriff testified if the sale is consummated and if it receives $50,000 form [*sic*] Bankers it will pay over $6,000.00 to the [C]ity for back real estate taxes and over $1,200 [t]o the [C]ity for year 2000 real estate taxes.
>
> Similarly the sheriff testified that of the $50,000 it receives from Bankers, it will pay over $12,000 to the City in its incarnation as the Philadelphia Gas Works. PGW is listed in Debtor's schedules as an unsecured claim. It has filed no separate claim from that filed by the City.[16] In a liquidation the [C]ity would receive only the amount of its proof of claim, approximately $700.00 as this is all that it is owed.

*Id.* As this explanation reveals, Debtor is not contending that the Sheriff's Sale is a preference because it enabled Bankers to receive more than it would in a Chapter 7 liquidation had the sale not occurred.

Rather, she contends that it is a preference because it would enable the City and PGW, through the Sheriff's distributions, to receive more than they would in a Chapter 7 liquidation. While this contention ultimately will be tested in the adversary proceeding recently filed, it is necessary for me to determine the likelihood of the sale being avoided as a preference to adjudicate the confirmability of Debtor's Plan. If Debtor can avoid the Sheriff's Sale, Bankers would be in the position of a secured creditor whose claim may be treated under the Plan.

I find no basis to conclude that § 547 can be used as a vehicle to avoid the Sheriff's Sale which has effected a transfer of the Residence (property of the Debtor) to Bankers for $50,000. The offending transaction is not that transfer but rather the yet to occur distribution of the sale proceeds. That a certain portion of the consideration (not property of the Debtor) to be received for such transfer will be distributed to third parties in amounts to which they arguably would not be entitled in a Chapter 7 liquidation appears to stem from the Debtor's failure to object to the Sheriff's distribution. However, improper that may be, these scheduled distributions do not meet the elements of a preferential transfer under § 547.[17] First, they are not

---

the Adversary Proceeding which she filed in August of 2000. The motion was denied.

16. While the Debtor has listed PGW as an unsecured creditor, on September 4, 2001 PGW filed a secured claim in the amount of $14,221.80 based on municipal claims for gas service which are entitled to lien status pursuant to 53 P.S. § 7101 *et seq.* While this proof was filed after the record was closed in this case, it presumably will be a factor in the new adversary proceeding, and unless challenged by the Debtor, would eliminate another element of § 547 as to PGW, *i.e.,* PGW would not be receiving more than it would be entitled to in a liquidation of the Residence.

17. Section 547 provides, in pertinent part,

> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
> (A) on or within 90 days before the date of the filing of the petition; or
> (B) between ninety days and one year before the date of the filing of the peti-

transfers of property of the Debtor. Second, they did not occur prior to the bankruptcy petition being filed. Additionally, with respect to the City, the payment is not on account of an antecedent debt based on Debtor's contention that the City denies owing any real estate taxes. *See Butz v. Wheeler,* 17 B.R. 85, 88 (Bankr.S.D.Ohio 1981) (holding that, since wife did not provide legal consideration to create an antecedent debt "owed" by her debtor-husband, his transfer to her of one-half of certain check proceeds was merely a pre-petition gratuitous transfer and was not a transfer made on account of an antecedent debt). More likely if the City agrees that it is owed no real estate taxes, it would have no legal basis for accepting any distribution from the Sheriff notwithstanding what his schedule provides. Finally, as Bankers has pointed out, Debtor had a means under state law for preventing an improper distribution. *See* Pa.R.C.P. 3136(d)–(f)(setting forth procedure for filing exceptions to the Sheriff's proposed distribution schedule and obtaining a ruling thereon). The distributions to the City (if indeed one is accepted) and PGW (if not on account of municipal liens) are plainly improper but not because they are preferential transfers that support the avoidance of a transfer that clearly is not preferential, *i.e.,* the sale of the Residence pursuant to the foreclosure judgment obtained by Bankers. It is counterintuitive to allow Debtor to forego utilizing her rights under state law to object to the proposed distributions to specific third parties (the City

and PGW) and then bring a preference action to have the entire Sheriff's Sale avoided affecting the rights of the Bank as foreclosing creditor and innocent purchaser. *See In O'Neill v. Dell (In re O'Neill),* 204 B.R. 881, 893 (Bankr.E.D.Pa.1997) (concluding that it would be "counterintuitive to allow the Debtor to forego the appropriate means [under state law] for adjusting the amount of the [foreclosure] judgment and instead parlay this slight error against him into a preference claim.").

**C. Whether Debtor is Entitled to Cure Pursuant to Section 1322(c)(1)**

Section 1322(c)(1) provides:

Notwithstanding subsection (b)(2) and applicable nonbankruptcy law—

> (1) a default with respect to, or that gave rise to, a lien on the debtor's principal residence may be cured under paragraph (2) or (5) of subsection (b) until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law[.]

11 U.S.C. § 1322(c)(1). As I discuss more fully below, this provision was enacted pursuant to the Bankruptcy Reform Act of 1994 specifically to overturn the Third Circuit's decision in *In re Roach,* 824 F.2d 1370 (3d Cir.1987), which held that a debtor's right to cure and reinstate a home mortgage terminates under New Jersey law upon entry of a foreclosure judgment,[18] *In re Bobo,* 246 B.R. 453, 455

---

tion, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

**18.** According to the legislative history pertinent to § 1322(c)(1), Congress considered the holding in *Roach* "in conflict with the fundamental bankruptcy principle allowing the debtor a fresh start through bankruptcy."

(Bankr.D.C.2000), and generally to provide a uniform standard for when a Chapter 13 debtor loses his right to cure and reinstate a home mortgage, *In re Beeman*, 235 B.R. 519, 524 (Bankr.D.N.H.1999).

Debtor contends that she is entitled to "redeem [her] interest" in the Residence pursuant to § 1322(c)(1), "without regard to the interest of the successful purchaser by complying with 11 U.S.C. § 1325(a)(5), which the plan does" because: (i) the Sheriff's Sale is not complete; and (ii) was not conducted in accordance with applicable non-bankruptcy law. Debtor's Brief at 13. I will address these arguments in turn.

### (1) *The Termination Point of Cure Rights Under § 1322(c)(1)*

With regard to the first point, Debtor asserts that § 1322(c)(1) safeguards a debtor's rights to cure home mortgage defaults until the sale process is complete which she posits occurs only when "the entire amount of the bid is paid to the sheriff and the sheriff delivers a deed to

the successful bidder." *Id.* at 21. Bankers disagrees. According to Bankers, a sheriff's sale is complete under Pennsylvania law when the hammer falls at the sale. Since the hammer fell at the Sheriff's Sale of the Residence, Bankers contends the sale is complete and Debtor is not entitled to the protection of § 1322(c)(1).

While I am unaware of any Court of Appeals decision construing the meaning of the phrase "sold at a foreclosure sale" as used in § 1322(c)(1),[19] many lower courts have grappled with the issue.[20] No majority viewpoint has emerged.

Some courts have concluded that the statute is unambiguous and clearly identifies the date of the foreclosure sale as the cut-off for curing a default under a mortgage.. *See e.g., McCarn v. WyHy Federal Credit Union (In re McCarn)*, 218 B.R. 154, 160 (10th Cir. BAP 1998) ("The language of section 1322(c)(1) is clear and unambiguous in establishing the date of

---

H.R.Rep. No. 835, 103rd Cong., 2d Sess. 52 (1994).

**19.** In *Commercial Federal Mortgage Corporation v. Smith (In re Smith)*, 85 F.3d 1555 (11th Cir.1996), the Eleventh Circuit acknowledged that § 1322(c)(1) was not applicable to the matter before it since the provision was added in 1994 and the debtor had filed his bankruptcy case in 1993, but nevertheless stated in dicta:

> It should be noted, however, that if we were to apply the amended version of section 1322, the foreclosure sale of [the debtor's] property most likely would have cut off his ability to cure the default on his mortgage. *See In re Sims*, 185 B.R. 853, 867 (Bankr. N.D.Ala.1995) (holding that the amended section 1322(c)(1) unambiguously prohibits the debtor from reinstating the mortgage under a Chapter 13 plan where there has been a prepetition foreclosure sale).

85 F.3d at 1558 n.3.

**20.** Based on my independent research, I am aware of only one case in this district construing the meaning of the language in

§ 1322(c)(1). In *In re Belmonte*, 240 B.R. 843, 852 (Bankr.E.D.Pa.1999) (Raslavich, J.), the bankruptcy court declared that § 1322(c)(1) "definitely sets the date of sheriff's sale as the cutoff point after which a mortgage default can no longer be cured." Expounding further on the issue at a subsequent point in the decision, the court stated:

> The position that a bare possessory interest in property bestows sufficient rights upon a debtor to reinstate a residential installment land contract is at odd with the authority previously discussed. Section 1322(c)(1), as noted cuts off cure rights at the time of sheriff's sale because that is the point in time at which a debtor's underlying legal and/or equitable interest in the property ends. The occurrence of a sheriff's sale, moreover, is not determinative of a debtor's possessory interest in property, because nothing automatically prevents a debtor from remaining on the premises after it is sold and retaining bare possession, even if the debtor has no right to possession and cannot reinstate his former mortgage.

*Id.* at 854.

the actual foreclosure sale as the cut-off for curing a mortgage default under section 1322(b).”); *In re Bobo, supra,* 246 B.R. at 456 (“Although the foreclosure sale may require steps after the foreclosure sale to make that sale effective, the statute's focus is on the foreclosure sale having been conducted in accordance with applicable nonbankruptcy law, not on the subsequent steps required to give that sale effect.”); *In re Danaskos,* 254 B.R. 416 (Bankr.N.D.Ill.2000) (ruling that statute is unambiguous and that when property is “sold at an auction held pursuant to a foreclosure judgment and the high bidder acquire[s] a right to title upon confirmation of that sale[,]” the property has been “sold at foreclosure sale” for purposes of § 1322(c)(1)); *In re Watts,* 2000 WL 1690311 (Bankr.D.S.C. Oct. 27, 2000) (adopting “the reasoning of the courts that have held that the language of § 1322(c)(1) is clear and unambiguous in establishing the date of the actual foreclosure sale as the cut-off date for curing mortgage defaults.”); *Homeside Lending, Inc. v. Denny (In re Denny),* 242 B.R. 593, 596 (Bankr.D.Md.1999) (“Giving effect to the plain language of the statute, this court finds that the phrase ‘sold at a foreclosure sale’ takes its common and ordinary meaning and refers to the actual date of the sale.”); *In re Crawford,* 232 B.R. 92 (Bankr.N.D.Ohio 1999) (finding that statute is “clear” and that a “straightforward reading” of the clause “until such residence is sold at a foreclosure sale” is that “the cut-off point is when the gavel comes down on the last bid at the foreclosure sale.”). Other courts have held the exact opposite, namely that the unambiguous language of the statute provides that a debtor's cure rights are cut-off when the foreclosure sale is complete which is determined by state law. *See e.g., In re Beeman,* 235 B.R. 519, 524 (Bankr.D.N.H. 1999) (concluding that § 1322(c)(1) is un-ambiguous and provides that a debtor's right to cure and reinstate a mortgage ends when a foreclosure sale process is complete which is determined by state law); *In re Rambo,* 199 B.R. 747, 751 (Bankr.W.D.Okla.1996) (reasoning that since “property is ‘sold’ at a foreclosure sale only when the sale is completed[,]” the language in § 1322(c)(1) “can only be interpreted to mean that cure is permitted until ...all the steps required by [local law] in order to complete and validate the sale have been taken.”). One court, while finding the statute to be ambiguous, held, based on the legislative history, bankruptcy policy and a “natural reading” of the statute, that a debtor's right to cure under § 1322(c)(1) terminates on the date of the foreclosure sale. *See In re Simmons,* 202 B.R. 198 (Bankr.D.N.J.1996). Yet, another court in the same district, while agreeing that the statute is ambiguous, held that “the most consistent interpretation of the legislative history of § 1322(c)(1) is to allow a debtor to cure a mortgage up to the time a sale becomes final[ ]” under state law. *In re Downing,* 212 B.R. 459, 464 (Bankr.D.N.J.1997).

Other courts have concluded that the language of the statute requires an analysis of applicable nonbankruptcy law to determine when property is “sold at a foreclosure sale.” *See e.g., Schinck v. Stephens (In re Stephens),* 221 B.R. 290, 294 (Bankr.D.Maine 1998) (“With this phrase [referring to “foreclosure sale that is conducted in accordance with applicable nonbankruptcy law”] Congress has, in effect, directed that I look to the state law for the meaning of ‘foreclosure sale.’ ”); *In re Jones,* 219 B.R. 1013, 1015 (Bankr.N.D.Ill.1998) (stating that the “sole issue before the Court is whether, under Illinois law, a ‘residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy

law' when the proverbial gavel drops at an auction conducted pursuant to a court-ordered foreclosure sale, or at the later point of the state court's entry of the order of confirmation in the sale."). However, courts applying this view, even from the same state, have reached contrary conclusions. *See e.g., Randall v. Equicredit Financial Services Corp. (In re Randall)*, 263 B.R. 200 (D.N.J.2001) (concluding that property is not "sold at a foreclosure sale" under New Jersey law until the sheriff delivers the deed because until such time, legal title to the property does not vest in the purchaser); *In re Hric*, 208 B.R. 21 (Bankr.D.N.J.1997) (Stripp, J.) (concluding that property is "sold at a foreclosure sale" under New Jersey law when the auction occurs); *In re Ziyambe*, 200 B.R. 790 (Bankr.D.N.J. 1996) (Gambardella, J.) (ruling that property is "sold at a foreclosure sale" under New Jersey law on the day of the foreclosure sale when the property is successfully bid upon). Still other courts interpreting the statute have concluded that property is not "sold at a foreclosure sale" until the sale is complete and that nonbankruptcy law must be applied to make that determination. *See In re Blair*, 196 B.R. 477, 480 (Bankr.E.D.Ark. 1996); *In re Spencer*, 263 B.R. 227 (Bankr.N.D.Ill.2001).

Significantly, Debtor failed to cite any cases construing the meaning of § 1322(c)(1). Moreover, Bankers cited only one case, namely *In re Hric, supra*, wherein the bankruptcy court, utilizing New Jersey state law, held that the phrase "sold at a foreclosure sale" in § 1322(c)(1) refers to the auction itself and not the date on which the sheriff delivers the deed.[21] While not disclosed by Bankers, the holding and rationale of *Hric* were flatly rejected by the district court in *Randall v. Equicredit Financial Services Corp., supra*, which held that property is "sold at a foreclosure sale" under New Jersey law when the sheriff delivers the deed since that is when the sale is complete.[22]

■ I am in agreement with those courts which conclude that the language of § 1322(c)(1) is ambiguous. I think it is impossible to determine, solely from the language of the statute, whether Congress intended a debtor's cure rights to terminate on the date of the auction sale or upon completion of the foreclosure sale process. When statutory language is unclear, courts refer "to the legislative history of the statute and the atmosphere in which it was enacted in an attempt to determine congressional intent." *United States v. Gregg*, 226 F.3d 253, 257 (3d

---

**21.** In analyzing this issue, the *Hric* court noted that New Jersey Superior Court Rule 4:64, entitled "Sale of Property; In General," "repeatedly refers to the event of the auction as the 'sale' and distinguishes 'sale' from the delivery of the deed." 208 B.R. at 25. The court also took judicial notice that "parties to the State's foreclosure practice refer to the auction as the 'sale.'" *Id.* Based on these observations, the court reasoned, "debtors are ... arguing for a definition of 'sale' which differs from that employed by state court rule and practice on foreclosure sales." *Id.*

**22.** In reaching this conclusion, the district court observed that under New Jersey law, a mortgagor retains the right "to redeem within

a ten-day period after the foreclosure auction, as provided in N.J. Court R. 4:65–5, or until an order confirming the sale is entered if objections are filed." 263 B.R. at 203. Noting that a debtor still possesses an interest in property "until the equity of redemption is extinguished," the district court reasoned that a debtor's right and title to property under New Jersey law is extinguished, if no objections are filed, upon delivery of a sheriff's deed or, if objections are filed, until an order confirming the sale is entered. Consequently, the Court stated, "absent objections, legal title does not vest, and thus the sale is not complete, until the sheriff delivers the deed." *Id.*

Cir.2000), *cert. denied,* 121 U.S. 1600, 121 S.Ct. 1600, 149 L.Ed.2d 467 (2001). *See also Dowd v. United Steelworkers of America, Local No. 286,* 253 F.3d 1093, 1099 (8th Cir.2001) (*quoting United States v. McAllister,* 225 F.3d 982, 986 (8th Cir. 2000)) (when the language of a statute is ambiguous, courts should consider " 'the purpose, the subject matter and the condition of affairs which led to its enactment.' "); *Pelt v. State of Utah,* 104 F.3d 1534, 1538 (10th Cir.1996) ("In ascertaining Congress' intent, it is helpful to examine the circumstances surrounding the problems that Congress was addressing."); *Indiana National Corp. v. Rich,* 712 F.2d 1180, 1182 (7th Cir.1983) ("In perusing the legislative history for signs of congressional intent, we are directed to pay particular attention to the contemporary legal context in which the statute was enacted."). Following this rule of statutory construction, I will examine the status of the law prior to the enactment of § 1322(c)(1) and then turn to the statute's legislative history.

(a) Legal Context

Before Congress amended § 1322 by adding subsection (c)(1), no circuit court of appeals had held that a debtor had a right based on § 1322(b) to cure a default on a home mortgage after the property was sold at a foreclosure sale. *See State of Oregon v. Hurt (In re Hurt),* 158 B.R. 154, 156 (9th Cir. BAP 1993) (noting that while "all of the circuit courts that have addressed the cure provisions in § 1322(b)(5) agree that the default may be cured after the contractual acceleration of the full mortgage[,] . . . none of the circuit courts have held that a home mortgage default may be cured during a redemption period following a foreclosure sale."); *In re Christian,* 199 B.R. 382, 386 (Bankr. N.D.Ill.1996) (observing that "[o]f all the circuit courts to rule on the question [prior to the enactment of § 1322(c)(1)], only the Third Circuit held that a point other than the foreclosure sale should be the cutoff for cure under § 1322(b)(5)[.]"), *reversed on other grounds,* 214 B.R. 352 (N.D.Ill. 1997). Rather, three courts of appeal as well as the Bankruptcy Appellate Panel for the Ninth Circuit had held that a debtor's right to cure defaults on a home mortgage under § 1322(b)(5) is cut off when the property is sold at a foreclosure sale.[23] *See State of Oregon v. Hurt (In re Hurt),*

---

23. Based on my research, prior to the enactment of § 1322(c)(1), neither the First Circuit Court of Appeals nor the Fourth Circuit Court of Appeals had discussed a debtor's right to cure in relation to a foreclosure proceeding. The Second Circuit had issued a decision holding that a debtor has a right cure a default on and reinstate a mortgage under § 1322(b)(5) even though the mortgage loan was accelerated pre-petition, but the decision did not express any view on whether such right terminated at any point in time such as when a foreclosure judgment was entered or a foreclosure sale was held. *See Di Pierro v. Taddeo (In re Taddeo),* 685 F.2d 24 (2d Cir. 1982). *See also In re Acevedo,* 26 B.R. 994 (E.D.N.Y.1982) (holding, in reliance upon the rationale of *Di Pierro v. Taddeo (In re Taddeo), supra,* that a debtor under Chapter 13 may utilize § 1322(b)(3) and (b)(5) to "de-accelerate a mortgage obligation and reinstate its

original payment schedule at any time prior to the actual sale of the encumbered property.").

The Seventh Circuit had issued two decisions on the termination point of the right to cure, but the second decision seems to conflict with the first one. In *In re Clark,* 738 F.2d 869 (7th Cir.1984), the Seventh Circuit Court of Appeals held that, under the law of Wisconsin, a debtor could "cure" a default on a home mortgage after the entry of a foreclosure judgment since such a judgment does no more than "judicially confirm the acceleration." The Court expressed no view on whether the same result would apply after a foreclosure sale or "in a state in which the effect of a judgment of foreclosure is different." *Id.* at 874. Subsequently, in *Goldberg v. Tynan (In re Tynan),* 773 F.2d 177 (7th Cir.1985), the Seventh Circuit Court of Ap-

*supra,* 158 B.R. at 160 (agreeing with "the majority of circuits that have concluded the foreclosure sale is the correct point to cutoff the right to cure under § 1322(b)(5).");[24] *Jim Walter Homes, Inc. v. Spears (In re Thompson),* 894 F.2d 1227 (10th Cir.1990) (holding that a debtor's right to cure a home mortgage default under § 1322(b) continues until a foreclosure sale at which the property is purchased by an independent third party); *The Federal Land Bank of Louisville v. Glenn (In re Glenn),* 760 F.2d 1428 (6th Cir.1985) (finding no "clear-cut statutory language or legislative history" as to whether § 1322(b) "allows a cure once a default on a mortgage has triggered acceleration of the debt, judgment or a sale,"

the court reached a "pragmatic" result, ruling that "the cut-off date of the statutory right to cure defaults is the sale of the mortgaged premises."); *Grubbs v. Houston First American Savings Association,* 730 F.2d 236, 240 (5th Cir.1984) (stating that "courts interpreting [§ 1322(b)] are in general agreement that a proposed plan may cure a pre-petition default if the debt has not been accelerated prior to a filing of a Chapter 13 petition and that an accelerated debt may not be cured if it has actually resulted in a foreclosure sale to a third party[,]" but as to situations between these limits, the case law is in dispute). In addition, the Eighth Circuit Court of Appeals, in construing a parallel provision under Chapter 12, had reached the same

peals held, without discussing the effect of a foreclosure judgment under the applicable state law of Illinois, that debtors whose home was sold pre-petition at a foreclosure sale following the entry of a foreclosure judgment against them could not utilize 1322(b)(5) to cure the default on their mortgage because "there was no default to cure after judgment of foreclosure was entered." *Id.* at 178. Elaborating on this point, the Seventh Circuit stated:

> [The third party purchaser at the Sheriff's Sale] satisfied the debt which [the debtors] owed to the bank that had made the mortgage loan upon the property. *See First Financial Savings and Loan Ass'n v. Winkler,* 29 B.R. 771, 773 (N.D.Ill.1983) (there is no "mortgage" under which a Chapter 13 debtor can cure arrearages after entry of judgment of foreclosure and sale). [The purchaser] is a stranger to the property, not a creditor. Nor is he the mortgagee. The court correctly determined that § 1322(b)(5) is inapplicable to these facts.

*Id.* Because this rationale focuses on the role of the third party purchaser at the foreclosure sale and not the effect of a foreclosure judgment, it suggests that, despite the Seventh Circuit's reference to "foreclosure judgment" in its holding, the integral event to the Seventh Circuit's decision may have been the fact that the property was sold at a foreclosure sale and not that a foreclosure judgment was entered. Indeed, in a footnote in *Goldberg,*

the Seventh Circuit distinguished its earlier decision in *In re Clark* stating that the case was "inapposite because it arose under Wisconsin law, the mortgage lender opposed the Chapter 13 plan, and *no foreclosure sale had occurred before the Chapter 13 petition was filed."* *Id.* at 178 n. 2 (emphasis added). When viewed as ruling that a debtor's right to cure is cut off as of the date of a foreclosure sale rather than the entry of a foreclosure judgment, the Seventh Circuit's decision in *Goldberg* is harmonized with *In re Clark.*

Subsequent to the enactment of § 1322(c)(1), the Eleventh Circuit ruled, in a bankruptcy case to which § 1322(c)(1) was inapplicable because the case was filed in 1993, that while a debtor whose home has been sold prepetition at a foreclosure sale may retain the statutory right of redemption under Alabama law with respect to his home mortgage, he must exercise the right as dictated under Alabama law and cannot cure the default and modify the mortgage in reliance upon § 1322(b). *See Commercial Federal Mortgage Corporation v. Smith (In re Smith), supra.*

**24.** In *Department of Veterans' Affairs v. Braker (In re Braker),* 125 B.R. 798 (9th Cir. BAP 1991), the Bankruptcy Appellate Panel ruled that a Chapter 13 plan could not "cure and reinstate a mortgage subsequent to a prepetition foreclosure sale, but prior to the expiration right of redemption."

view. *See Justice v. Valley National Bank,* 849 F.2d 1078 (8th Cir.1988) (concluding that the cure provisions of § 1222(b) are not applicable after a foreclosure sale has been held). Only the Third Circuit, in *In re Roach, supra,* had reached a different conclusion, ruling that a debtor's right to cure a home mortgage in New Jersey under § 1322(b) terminates upon the entry of a foreclosure judgment.

(b) Legislative History

■ Against this backdrop of courts of appeals' decisions which, other than *Roach,* held that a debtor's right to cure under § 1322(b) continues until a foreclosure sale, Congress enacted § 1322(c)(1). The legislative history to this provision, states, in pertinent part:

Section 1322(b)(3) and (5) of the Bankruptcy Code permit a debtor to cure defaults in connection with a chapter 13 plan, including defaults on a home mortgage loan. Until the Third Circuit's decision in *Matter of Roach,* 824 F.2d 1370 (3d Cir.1987), all of the Federal Circuit Courts of Appeal had held that such right continues at least up until the time of the foreclosure sale. *See In re Glenn,* 760 F.2d 1428 (6th Cir.1985), *cert. denied,* 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985); *Matter of Clark,* 738 F.2d 869 (7th Cir.1984), *cert. denied,* 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985). The *Roach* case, however, held that the debtor's right to cure was extinguished at the time of the foreclosure judgment, which occurs in advance of the foreclosure sale. This decision is in conflict with the fundamental bankruptcy principle allowing the debtor a fresh start through bankruptcy.

This section of the bill safeguards a debtor's rights in a chapter 13 case by allowing the debtor to cure home mortgage defaults at least through completion of a foreclosure sale under applica-

ble nonbankruptcy law. However, if the State provides the debtor more extensive "cure" rights (through, for example, some later redemption period), the debtor would continue to enjoy such rights in bankruptcy.

H.R.Rep. No. 835, 103rd Cong., 2d Sess. (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3360–61. In the first paragraph quoted above, Congress made clear its disapproval of the Third Circuit's decision in *Roach* and declared that such decision was contrary to the goal of the Bankruptcy Code to provide debtors with a fresh start. In the second paragraph, Congress specifically addressed the purpose of § 1322(c)(1), stating that it was intended to allow debtors to cure home mortgages "through completion of a foreclosure sale under applicable nonbankruptcy law" without depriving debtors of more extensive cure rights that might be provided under state law. When viewed in the context of the circuit court decisions discussed above, I believe the phrase "through completion of a foreclosure sale under applicable nonbankruptcy law," as used by Congress, must be interpreted to mean, not completion of the entire foreclosure sale *process* since none of the courts of appeal had utilized such date in construing the cutoff point for the right to cure under § 1322(b), but the event of the foreclosure sale (*i.e.,* the auction). This interpretation is consistent with the following floor remarks made by Senator Grassley in support of the H.R. 5116 which became the Bankruptcy Reform Act of 1994:

Title III of the bill will assist homeowners. Some homeowners attempt to prevent their homes from being foreclosed upon, even though a bankruptcy court has ordered a foreclosure sale. There may be several months between the court order and the foreclosure sale. Section 301 will preempt conflicting

State laws, and permit homeowners to present a plan to pay off their mortgage debt *until the foreclosure sale actually occurs.*

140 Cong. Rec. S14462 (daily ed. Oct. 6, 1994) (emphasis added).

■■■■ Based on the aforementioned construction of the legislative history to § 1322(c)(1), I conclude that a debtor has the right to cure a home mortgage under § 1322(b) until a foreclosure sale of the property has been held.[25] Consequently, I must determine whether a foreclosure sale of Debtor's property occurred prior to the commencement of her Third Bankruptcy Case. Since foreclosure of real property is governed by state law, *see M.C. Schinck v. Stephens (In re Stephens),* 221 B.R. 290, 294 n. 10 (Bankr.D.Me.1998), I must turn to the law of Pennsylvania, the situs of the Residence, to make this determination. *See also In re Bobo, supra,* 246 B.R. at 458 (holding that state law must be used "to determine whether there have been steps that qualify as a 'foreclosure sale' within the meaning of § 1322(c)(1) and to deter-

mine whether those steps comported with state law requirements.").

**(c) Application of State Law to Determine Whether Property was Sold at a Foreclosure Sale**

■■■■ Under Pennsylvania law, a mortgagor has the right to redeem mortgaged property until the fall of the hammer at an originally scheduled sheriff's sale.[26] *In re Evergreen Memorial Park Association,* 308 F.2d 65, 67 (3d Cir.1962); *Peoples Bank v. Dorsey,* 453 Pa.Super. 94, 105, 683 A.2d 291, 296 (1996). Once the hammer has fallen at the sheriff's sale, the mortgagor has no right to redeem. *Bundy v. Donovan (In re Bundy),* 183 B.R. 700, 701 (Bankr.W.D.Pa.1995). The purchaser at the sheriff's sale obtains equitable ownership of the property and upon settling with the Sheriff, the right to compel delivery of the deed. *In re Brown,* 75 B.R. 1009, 1012 (Bankr.E.D.Pa.1987). At the time of the sale, the purchaser assumes an obligation to comply with the terms of the sale. *The Chase Manhattan Bank v. Pulcini (In re Pulcini),* 261 B.R.

---

**25.** Courts have discussed policy reasons for utilizing the foreclosure sale as the cutoff date for a debtor's right to cure. In support of its decision to use the foreclosure sale as the cutoff date, *Federal Land Bank of Louisville v. Glenn (In re Glenn), supra,* the Sixth Circuit listed the following reasons: (i) all forms of foreclosure, however, denominated involve a sale of the mortgaged property; (ii) the foreclosure sale "introduces a new element—the change of ownership and, hence, the change of expectations—into the relationship which previously existed"; (iii) a foreclosure sale normally occurs after considerable notice to the debtor providing him or her with the opportunity to take action to prevent it; (iv) using the date of the foreclosure sale as the cutoff points strikes a balance between the rights of debtors to cure defaults and the protection which Congress intends for mortgagees of private homes; and (v) use of a later date could chill the bidding process because "potential bidders may be discouraged

if they cannot ascertain when, if ever, their interest will become finalized." 760 F.2d at 1435–36.

**26.** 41 P.S. § 404(a) provides, in relevant part:

[A]fter a notice of intention to foreclose has been given pursuant to section 403 of this act, at any time at least one hour prior to the commencement of bidding at a sheriff sale ... the residential mortgage debtor ...may cure his default and prevent sale ... by tendering the amount or performance specified in subsection (b) of this section.

Section 7.2 of title 10 of the Pennsylvania Administrative Code defines the phrase "one hour prior to commencement of bidding" as used in 41 P.S. § 404 to mean "one hour prior to the scheduled start of the general proceeding at which the real property in question is *originally* listed for sale." 10 Pa. Adm.Code § 7.2 (italics added).

836, 841 (Bankr.W.D.Pa.2001); *Pennsylvania Co. For Insurances on Lives and Granting Annuities v. Broad Street Hospital,* 354 Pa. 123, 128, 47 A.2d 281, 283 (1946). No court confirmation or approval of the sale is required. *See* Pa.R.C.P. 3135(a) ("Confirmation of the sale by the court shall not be required."). Thus, at the fall of the hammer, the mortgagor loses rights and the purchaser acquires rights and obligations. While a procedure exists under Pennsylvania law for seeking to have a foreclosure sale set aside, *see* Pa.R.C.P. 3132 ("Setting Aside Sale"), even the rule setting forth the procedure recognizes that a sale has occurred.[27] Furthermore, while additional steps must be taken to make the sale effective and conclude the foreclosure process (*i.e.,* preparation of schedule of distribution, distribution of proceeds of sale, execution and delivery of the deed), the rules establishing such steps also recognize that a sale has taken place.[28] Therefore, I conclude that, under the law of Pennsylvania, property is sold at a foreclosure sale on the date the

sale is held. *See Jefferson Medical College of Philadelphia v. Broad Street Hospital, supra,* 354 Pa. at 128–34, 47 A.2d at 283–86 (reviewing case law applying principle that, in Pennsylvania, a sheriff's sale "takes place when the hammer falls."). *Accord McCarn v. WyHy Federal Credit Union (In re McCarn),* 218 B.R. 154, 161–62 (10th Cir. BAP 1998) (concluding that under the law of Wyoming, property is sold on the date of the foreclosure sale since the substantive rights of the parties are fixed on that date and there is no requirement that foreclosure sales be confirmed or approved by the court); *Homeside Lending, Inc. v. Denny (In re Denny),* 242 B.R. 593, 597–99 (Bankr.D.Md. 1999) (ruling that under the law of Maryland wherein a purchaser at a foreclosure sale obtains equitable title with the equitable right to legal title upon ratification and payment of the amount bid at the action and the debtor has no further right to redeem, property is sold at a foreclosure sale on the date of the auction). *Compare*

---

**27.** Rule 3132 provides:
 Upon petition of any party in interest before delivery of the personal property or of the sheriff's deed to real property, the court may, upon proper cause shown, set aside *the sale* and order a resale or enter any other order which may be just and proper under the circumstances.
Pa.R.C.P. 3132 (emphasis added).

**28.** Rules 3135 and 3136 state, in pertinent part:
 Rule 3135. Sheriff's Deed to Real Property
 (a) When real property is *sold* in execution and no petition to set aside the sale has been filed, the sheriff, at the expiration of ten days after the filing of the schedule of distribution, shall execute and acknowledge before the prothonotary a deed to the property *sold.* The sheriff shall forthwith deliver the deed to the appropriate officers for recording and for registry if required. Confirmation of the sale by the court shall not be required.
 Rule 3136. Distribution of Proceeds

(a) Not later than thirty days *after the sale of real property* and not later than five days after the sale of personal property, the sheriff shall prepare a schedule of proposed distribution of the proceeds of sale which shall be kept on file and shall be available for inspection in the sheriff's office. No schedule of distribution or list of liens need be filed when the property is sold to the plaintiff for costs only.

 ＊ ＊ ＊ ＊ ＊ ＊

(c) In sales of real property the sheriff shall attach to the schedule a list of liens *upon the property sold* as certified from the record by the proper officers or a guaranteed search from any title company authorized to do business within the county. The cost of certifying the list of liens or the title search, the acknowledgment, recording and registry of the deed and transfer or documentary stamps shall be charged as an expense of distribution.
Pa.R.C.P. 3135 & 3136 (emphasis added).

*McEwen v. Federal National Mortgage Association,* 194 B.R. 594, 596–97 (N.D.Ill. 1996) (*quoting Citicorp Savings of Illinois v. First Chicago Trust Co.,* 269 Ill.App.3d 293, 206 Ill.Dec. 786, 793, 645 N.E.2d 1038, 1045 (1995)) (concluding that a foreclosure has sale has not been conducted under the law of Illinois until the judicial sale has been confirmed by the court because " 'the highest bid received by a sheriff at a judicial sale is merely an irrevocable offer to purchase the property and acceptance of the offer takes place when the court confirms the sale.' "); *In re Barham,* 193 B.R. 229, 232 (Bankr.E.D.N.C.1996) (reasoning that a foreclosure sale in North Carolina is not complete until after the expiration of the ten day upset bid period since only at the end of such period does the purchaser's rights to the property become "fixed."). Since the foreclosure sale in the instant case was held on July 11, 2000, the Residence was sold at a foreclosure sale prior to the commencement of Debtor's Third Bankruptcy Case.

(2) *Whether the Sheriff's Sale Was Conducted in Accordance with Applicable Nonbankruptcy Law*

 Under § 1322(c)(1), the foreclosure sale at which the debtor's principal residence was sold must have been "conducted in accordance with applicable nonbankruptcy law" in order to cut off the debtor's right to cure. 11 U.S.C. § 1322(c)(1). Based on the "misleading notice" that was published in the Legal Intelligencer three times before the Sheriff's Sale, Debtor contends this requirement is not met. Debtor's Brief at 13–15, 22–23.

Rule 3129.3 of the Pennsylvania Rules of Civil Procedure provides:

(a) Except as provided by subdivision (b) or special order of court, new notice shall be given as provided by Rule 3129.2 if a sale of real property is stayed, continued, postponed or adjourned.

(b) If the sale is stayed, continued, postponed or adjourned to a date certain within one hundred days of the scheduled sale, and public announcement thereof, including the new date, is made to the bidders assembled at the time and place originally fixed for the sale, no new notice shall be required, but there may be only one such stay, continuance, postponement or adjournment without new notice.

Pa.R.C.P. 3129.3. The Third Circuit discussed part (b) of this rule in *Taylor v. Slick,* 178 F.3d 698 (3d Cir.1999), *cert. denied,* 528 U.S. 1079, 120 S.Ct. 797, 145 L.Ed.2d 672 (2000). The debtor in the aforementioned case filed for bankruptcy on September 1, 1995, which was four days before property which he owned with his wife was scheduled to be sold at a sheriff's sale. *Id.* at 700–01. By oral announcement made at the originally scheduled sheriff's sale which, as in the instant case, the debtor did not attend, the sale was continued to October 23, 1995 "in accordance with Rule 3129.3(b)." *Id.* at 701. On October 17, 1995, the mortgagee sought relief from the automatic stay to continue with the sale. Debtor did not respond to the motion (which the Third Circuit noted "did not state that the sale was scheduled for October 23") or attend the hearing on the same. *Id.* Relief from the automatic stay was granted and the sheriff's sale took place as scheduled. The sheriff's deed was subsequently executed and recorded. On July 9, 1996, the debtor's bankruptcy case was dismissed. He subsequently filed an adversary complaint contending, *inter alia,*[29] that Rule

---

29. The debtor in *Taylor, supra,* also argued that the continuation of the sheriff's sale after

3129.3(b) violated his due process rights because he was not given notice of the rescheduled sale. The Third Circuit disagreed, concluding that the debtor was not "entitled to individualized written notice of the rescheduled sale, and because proper notice was provided pursuant to Rule 3129.3(b), the debtor's due process rights were not violated." *Id.* at 703. Regarding the sufficiency of notice under Rule 3129.3(b), the Third Circuit stated:

We hold that the notice requirement contained in Rule 3129.3(b) is reasonably calculated to reach interested parties to a sheriff's sale. The interested parties are the debtor, the creditor and the potential bidders for the property. In light of the Pennsylvania Superior Court's teachings in *Workingmen's Savings [and Loan Ass'n of Dellwood Corp. v. Kestner,* 438 Pa.Super. 186, 652 A.2d 327 (1994)], it is reasonable to expect that notice of a continuation of a sale will be announced at the scheduled sale date—because potential bidders will likely be unaware that the debtor has filed a bankruptcy petition—but it is not reasonable for a debtor to choose not to attend the scheduled sale simply because he knows that the sale will not be consummated at that time because of his ex parte intervention in the bankruptcy court. Because it can be expected that the debtor, the creditor and potential bidders will attend the sale, oral notice as provided by Rule 3129.3(b) comports with notions of due process.

178 F.3d at 703.

In reaching its decision, The Third Circuit also evaluated Rule 3129.3(b) "in conjunction with the purpose of the notice requirement in the context of a sheriff's

sale." *Id.* at 704. On this point, the Third Circuit opined:

The continuation of a sheriff's sale and public announcement of a new date are intended to assure notice to bidders interested in the subject property. *See, e.g., Greater Pittsburgh Business Development Corp. v. Braunstein,* 390 Pa.Super. 454, 568 A.2d 1261, 1265 (1989) [*sic*]. The debtor's true interest is to ensure that notice is given to potential bidders, rather than to ensure that the debtor receives notice, because the debtor is generally just a spectator who is concerned that the sale, whenever it may occur, brings the highest sale price possible. *See id.; Investors & Lenders Ltd. v. Finnegan,* 249 N.J.Super. 586, 592 A.2d 1244, 1248 (1991). Rule 3129.3(b) strikes a proper balance between providing notice to interested parties and allowing the creditor to avoid paying duplicative fees.

Here, Taylor suffered no constitutional disadvantage as a result of his voluntary absence from the originally scheduled sale. For him to contend now that he was prejudiced by his failure to receive notice of the new sale date when it was given is truly disingenuous. Taylor has not contended that he was deprived of the ability to bid on the property, nor has he established that the notice given resulted in the property being sold at too low a price because bidders were not aware of the continued sale date.

178 F.3d at 704.

Debtor contends *Taylor* is distinguishable from the instant case because: (i) unlike the debtor in *Taylor,* she did not receive notice of the original date for the Sheriff's Sale; (ii) the "clear uncomplicated

---

he had filed for bankruptcy was a violation of the automatic stay and therefore voided the sale. The Third Circuit disagreed, finding that the continuation of a sheriff's sale effec-

tuates the purpose of the automatic stay by preserving the status quo. 178 F.3d at 701–02. I discuss this contention in the next section. *See infra* at 124–25.

oral notice" provided in *Taylor* of the rescheduled sale date "was vitiated in the instant case by a written notice published on three separate occasions that provided the wrong sale date;" (iii) the publication of the notices in the Legal Intelligencer "caused Debtor to incur additional expenses which were added to her debt and made it that much more expensive and thus harder for her to prevent the sale through payment;" and (iv) unlike the debtor in *Taylor*, she acted promptly in challenging the sale. Debtor's Brief at 15. I am unpersuaded by these arguments.

Contrary to Debtor's assertion, I have concluded, based on the evidence in the record, that she was provided with notice of the originally scheduled Sheriff's Sale on April 4, 2000. Also, there is no evidence in the record identifying the portion of the cost that was or would have been charged to Debtor for the notices in the Legal Intelligencer or, more importantly, demonstrating that, but for the addition of such cost, she would have been able to prevent the Sheriff's Sale through payment. Furthermore, the fact that the debtor in *Taylor* remained "elusive" throughout the foreclosure process was not a basis for the Third Circuit's holding that Rule 3129.3(b) does not violate the Due Process Clause. *See Taylor, supra,* 178 F.3d at 703–04. Rather, the Third Circuit discussed the conduct of the debtor in *Taylor* because the foreclosure process occurred while his bankruptcy case was pending. The Third Circuit made the point that a debtor is not entitled to "believe that no sale will occur until his bankruptcy case has been adjudicated." *Id.* at 703.

Finally, I respectfully disagree with Debtor that the oral notice provided by the Sheriff in accordance with Rule 3129.3(b) was "vitiated" in this case by the "misleading" notices that were published in the Legal Intelligencer. Significantly, if public announcement of a postponed sheriff's sale is given pursuant to Rule 3129.3(b), which the Debtor does not contest was done in this case, then a sheriff is not required to provide new notice of the sale. Consequently, when the Sheriff in the instant case placed the notices of the Sheriff's Sale scheduled for July 11, 2000 in the Legal Intelligencer on June 12, June 19 and June 26, 2000, he was taking extra steps not required by the procedural rules to provide additional notice of the rescheduled sale. Thus, the deficiency in the notice complained of here is not that the Sheriff failed to provide notice that was required by law, *see e.g., Marra v. Stocker,* 532 Pa. 187, 615 A.2d 326 (1992) (ruling that lower court committed an error of law in denying petition to set aside sheriff's sale where appellants were not given notice from the mortgagor of its intention to foreclose as required by Act 6, 41 P.S. § 403), but that he took action beyond that required by the law that may have detrimentally affected the sale. The Pennsylvania Rules of Civil Procedure do not address such a situation. Neither have I uncovered any case law directly on point. However, according to case law in Pennsylvania, grounds exist for setting aside a sheriff's sale if there is evidence that a defect in notice of a sheriff's sale misled or deterred someone from bidding or resulted in a sale of the property "at a less price than would otherwise have been obtained." *See Bell v. Mock,* 413 Pa. 71, 74, 197 A.2d 610, 611 (1963) (if "someone was misled or deterred from bidding" because of failure to include improvements in advertisement of property, "the remedy is to set aside the sheriff's sale."); *Somerville v. Hill,* 260 Pa. 477, 104 A. 62 (1918) (affirming decision of lower court refusing to set aside sheriff's sale where appellant, who complained that the property was not accurately described and that irregularity

occurred in sale because the sheriff made an announcement at the sale that the property would not be offered for sale and then subsequently offered the property for sale, failed to show evidence of a material misdescription and an irregularity resulting in the "sale of the property at a less price than would otherwise have been obtained."). *See also Taylor v. Slick, supra,* 178 F.3d at 704 (rejecting debtor's argument that he was prejudiced by his failure to receive notice of the new date of a postponed sheriff's sale on ground that debtor failed to contend "that he was deprived of the ability to bid on the property" or establish "that the notice given resulted in the property being sold at too low a price because bidders were not aware of the continued sale date."). Applying this standard here, the deficiency in the notices in the Legal Intelligencer does not provide grounds for setting aside the Sheriff's Sale.

While the written notices published in the Legal Intelligencer may have been somewhat confusing in that they refer to the Sheriff's Sale as being held on June 6, 2000 as well as July 11, 2000, there is no evidence whatsoever in the record that they misled or deterred anyone from bidding or that they negatively affected the sale price of the property. Furthermore, having examined the notices, I find it highly unlikely that they would have misled any prospective bidder or caused him or her not to bid on the property.

The title for each of the notices at issue states in large, bold letters: "Sheriff's Sale Notices for July 11, 2000," which was the correct date for the sale. Moreover, the first sentence in the first column of the announcement states: "Properties to be sold by Sheriff John D. Green, on Tuesday, July 11, 2000[,]" which again was the correct date. Thus, while the notices contain repeated references thereafter to the prop-

erties listed therein as being offered for sale on June 6, 2000, I doubt anyone would not have noticed that July 11, 2000 was also given as the date for the sale. Moreover, since the notices appeared in the Legal Intelligencer *after* June 6, 2000, it would have been illogical for the sale to be scheduled for that date. Therefore, it is reasonable to assume that any person reviewing the notices would have: (i) come to the logical conclusion that the sale was scheduled for July 11, 2000 and not June 6, 2000; or (ii) made a telephone call to the Sheriff's Office to find out the proper date.

Furthermore, since potential bidders at the originally scheduled sale on April 4, 2000, were advised at that time of the new sale date, it is unlikely that the notices in the Legal Intelligencer confused any of them. Thus, if the erroneous notices confused anyone, it would have been individuals who did not attend the originally scheduled sale. Under Rule 3129.3(b), the Sheriff is not required to publish notice of the new sale date for such individuals. As the Third Circuit observed in *Taylor, supra,* the notice requirement in Rule 3129.3(b) is designed to reach "the debtor, the creditor and the potential bidders for the property." 178 F.3d at 703. Consequently, while the extra steps which the Sheriff took to provide notice to individuals who were not present at the originally scheduled sale of the new sale date may not have resulted in new bidders at the sale, the effort cannot be viewed as having prejudiced the sale. Thus, I disagree with the Debtor that the notices which were published in the Legal Intelligencer "vitiated" the public announcement of the postponed sale date that was given pursuant to Rule 3129.3(b).

Finding no grounds for setting aside the sale because of the "misleading notices" which appeared in the Legal Intelligencer, I hold that the Sheriff's Sale was conduct-

ed in accordance with Pennsylvania law. Consequently, the requirement of § 1322(c)(1) that the Residence be sold at a foreclosure sale conducted in accordance with applicable law before the right to cure her mortgage default may be cut off is satisfied.

### C. Whether the Sheriff's Sale is Void

In Count I of the Adversary Proceeding, Debtor seeks to have the Sheriff's Sale declared void because Defendants violated the automatic stay by causing the notices of the Sheriff's Sale to be published in the Legal Intelligencer during the pendency of her Second Bankruptcy Case. *Id.* at 16.[30] Complaint ¶¶ 67–68. In the event Debtor succeeds in obtaining such relief, she would be permitted to cure the default on her mortgage under 11 U.S.C. § 1322(c)(1) since no sheriff' sale would have occurred. Therefore, without deciding the Adversary Proceeding, I must examine the likelihood that Debtor will prevail on her claim in Count I to have the Sheriff's Sale declared void.

In *Taylor v. Slick, supra,* the Third Circuit addressed two issues. I discussed the first issue (*i.e.,* whether Rule 3129.3(b) violated the debtor's due process rights because he was not given notice of the rescheduled sale) above. The second issue, namely whether the postponement or continuation of a sheriff's sale violates the automatic stay provisions of 11 U.S.C. § 362(a), is relevant here. In addressing this issue, the Third Circuit noted that the relevant provision of § 362(a) provides:

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302 or 303 of this title …

operates as a stay applicable to all entities, of—

> (1) the commencement or *continuation,* including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the Debtor that was or could have been commenced before the commencement of the case.

11 U.S.C. § 362(a) (emphasis added). Construing the word "continuation" in conjunction with the other words surrounding it such as "commencement," the Third Circuit concluded that, pursuant to § 362(a)(1), "the filing of a bankruptcy petition prohibits the beginning ('commencement') of a judicial proceeding and the carrying forward ('continuation') of a proceeding that has already begun." 178 F.3d at 702. Based on this construction of the statute, the Third Circuit ruled as follows:

> The "continuation" of a sheriff's sale … connotes the postponement of a proceeding, and effectuates the purposes of § 362(a)(1) by preserving the status quo until the bankruptcy process is completed or until the creditor obtains relief from the automatic stay. *See Workingmen's Services [Savings and Loan Association of Dellwood Corp. v. Kestner,* 438 Pa.Super. 186], 652 A.2d at 328 ("Postponement notices which specify a new sale date merely preserve the status quo between creditor and debtor.") *see also Zeoli [v. RIHT Mortgage Corp.,* 148 B.R. 698, 701 (D.N.H.1993)] ("The postponement of a foreclosure sale is certainly an 'act.' But it is not an act in 'continuation' of a proceeding 'against the debtor' prohibited by § 362(a)(1).

---

**30.** As I noted above, *see supra* at n. 9, in Count II of the Complaint, Debtor also seeks to have the Sheriff's Sale declared void due to a defect in the complaint which Bankers filed to obtain its default judgment in mortgage foreclosure. In her brief in support of confir-

mation, Debtor has not discussed her claim in Count II which seeks to have this Court look beneath the final judgment of the state court. As Debtor has not articulated any theory that would allow me to do so, I find no grounds to address that contention here.

Rather it is more appropriately characterized as an act in preservation of the stayed proceeding.")

178 F.3d at 702. Explaining this point further, the Third Circuit stated:

A postponement notice does not, by itself, permit the rescheduled sheriff's sale to occur. So long as the bankruptcy petition is pending before the bankruptcy court, a creditor must apply for and obtain relief from the stay before it can proceed with the sale on the date certain. Rule 3129.3(b), Pennsylvania Rules of Civil Procedure, preserves the status quo and permits the creditor to avoid duplicative foreclosure costs that would eventually be deducted from the proceeds of the sale (to the disadvantage of the debtor). *See Zeoli,* 148 B.R. at 701. It is therefore clear that Rule 3129.3(b) comports with § 362(a)(1).

178 F.3d at 702. Applying its ruling to the facts before it, the Third Circuit declared:

Once Taylor filed his bankruptcy petition here, the sale was postponed. Although a new proposed sale date was announced, no act had occurred that prejudiced Taylor or otherwise altered his position with respect to the property. In accordance with the Bankruptcy Code, Slick then sought relief from the stay and served notice on Taylor. Taylor did not respond to the motion for relief, and relief was granted Slick pursuant to 11 U.S.C. § 362(d). Upon receiving relief from the stay, Slick was permitted to proceed with the sheriff's sale so long as notice requirements had been met. The bankruptcy court properly rejected Taylor's argument that the continuation of the sheriff's sale violated § 362(a)(1).

178 F.3d at 702 (footnote omitted).

 Like in *Taylor,* the Sheriff's Sale in the instant case was postponed to a new date by oral notice given on the origi-

nally scheduled date. Under the holding in *Taylor,* the continuation of the Sheriff's Sale and oral notice of the new date did not violate the automatic stay because it merely preserved the status quo. However, unlike in *Taylor,* postponement notices in the instant case were subsequently placed in a newspaper and, most importantly, the cost of having the notices published was added to the amount of the foreclosure judgment against the Debtor. This act altered the status quo. Consequently, Debtor may be successful in establishing that the Sheriff and/or Bankers violated the automatic stay by causing the postponement notices to be published in the Legal Intelligencer. However, even if Debtor is successful on this point, that does not mean that she will be successful in obtaining a declaration that Sheriff's Sale is void.

Any creditor action taken in violation of the automatic stay is void *ab initio. In re Siciliano,* 13 F.3d 748, 750 (3d Cir.1994). A ruling that the Sheriff and/or Bankers violated the automatic stay by publishing or causing to be published the aforementioned notices in the Legal Intelligencer and having the cost of the notices added to the foreclosure judgment against the Debtor would mean that the notices and additional cost charged to the Debtor are void *ab initio.* Damages for violating the stay could also be imposed against the Sheriff and/or Bankers. However, since the written postponement notices were not a requirement under the Pennsylvania Rules of Civil Procedure for holding the Sheriff's Sale, *see supra* at 122, it does not follow that the Sheriff's Sale is void *ab initio.* Oral notice of the postponement of the sale was given in accordance with Pa.R.C.P. 3129.3(b). Thus, the notice requirements under the Pennsylvania rules were met for the Sheriff's Sale to proceed. Consequently, I am not persuaded that Debtor is

likely to prevail on her claim that the Sheriff's Sale is void due to a violation of the stay.

### D. Whether Bankers holds a Claim Secured By Collateral Other than the Residence

 Lastly, Debtor contends that Bankers is not protected by the anti-modification clause of 11 U.S.C. § 1322(b)(2) because, in addition to taking a security interest in the Residence, it took a security interest in an escrow account. Debtor's Brief at 23. Even assuming I agreed that Bankers had taken a security interest in property other than the Residence,[31] I am unclear where Debtor seeks to go with this argument. Her brief gives me no clue as to how § 1322(b)(2) which deals with modification of the rights of holders of secured claims furthers her cause. It certainly does not provide a vehicle to set aside the Sheriff's Sale. As a result of that event, Bankers is no longer the holder of a secured claim and Debtor's bankruptcy op-tions are regrettably constrained notwithstanding the multiple arguments made by her counsel.

### SUMMARY

I find merit in both Bankers' Claim Objection and Plan Objection. The Proof of Claim shall be stricken and confirmation shall be denied. A hearing shall be scheduled to address the status of this bankruptcy case, including whether dismissal is warranted. 11 U.S.C. § 1307(c).

An Order consistent with this Memorandum Opinion shall issue.

---

**31.** I am not persuaded by this contention. The Mortgage requires the Borrower to pay into escrow certain sums for taxes and assessments which may attain priority over the mortgage as a lien on the Property; leasehold payments or ground rents on the Property, if any; hazard or property insurance premiums; flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any. These funds are to be applied for the purposes of the escrow and are pledged as additional security for all sums secured by the Mortgage. Mortgage, at page 2, ¶ 2. While the Mortgage obviously permitted Bankers to maintain an escrow account, there is no evidence whatsoever in the record that such an account exists. As I stated in *In re Abruzzo*, 245 B.R. 201, 206–08 (Bankr.E.D.Pa.1999), *vacated and remanded on other grounds*, 2000 WL 420635 (E.D.Pa. April 10, 2000), "a mortgagee will not have a security interest in property which the debtor does not own notwithstanding that its mortgage on its face purports to take such an interest." Furthermore, in *In re Abruzzo*, *supra*, 245 B.R. at 209, I held that where the "sole function of an escrow account is to protect the value of the collateral already in place," a security interest in an escrow account does not provide a mortgagee with additional security for its mortgage. *See also In re Rosen*, 208 B.R. 345, 351–54 (D.N.J.1997) (ruling that security interest in escrow account was not taken as additional collateral of the debtor to secure the mortgage but was created to protect the mortgaged property); *Rodriguez v. Mellon Bank, N.A. (In re Rodriguez)*, 218 B.R. 764, 777–78 (Bankr.E.D.Pa. 1998) (Raslavich, J.) (concluding that security interest in escrow funds does not remove a mortgage from the anti-modification clause of § 1322(b) since the funds served the purpose of protecting and preserving the value of the mortgage on the property and are a typical feature in every home mortgage). A review of the items for which Debtor could have been required to escrow funds under the Mortgage reveals that the escrow account was for the general purpose of protecting and preserving the value of the Mortgage on the Property. Consequently, to the extent § 1322(b) is relevant here, the security interest in the escrow account did not and does not remove the Mortgage from the protection of the anti-modification clause in § 1322(b).